**Joseph A. JALBUENA, Appellant,**

v.

**John Foster DULLES, Secretary of State.**

**No. 12341.**

United States Court of Appeals Third Circuit.

Argued March 17, 1958.

Decided April 11, 1958.

Samuel Kagle, Philadelphia, Pa., for appellant.

Bernard F. Sheran, Asst. U. S. Atty., Philadelphia, Pa. (Harold K. Wood, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The Department of State having certified that, by operation of Section 401 (b) of the Nationality Act of 1940, 54 Stat. 1168, 8 U.S.C. 1946 ed. § 801(b), Joseph Jalbuena had lost his birthright United States citizenship, and the Department also having rejected his application for an American passport, Jalbuena brought this suit for a declaratory judgment in an effort to vindicate his claim that he is a citizen of the United States. The decision of the District Court was against Jalbuena's claim on its merits, and he has appealed.

Jalbuena's father was born in the Philippine Islands in 1892. His mother was born in the United States. They met and married while the elder Jalbuena was a medical student at the University of Pennsylvania. Thereafter, the appellant was born of this union in Philadelphia. During his infancy his parents took him to the Philippine Islands to live, he retaining his birthright United States citizenship.

By operation of law both the father and the son became citizens of the Republic of the Philippines in 1946 when those islands became a nation independent of the United States. The son was then an adult, and his American citizenship persisted despite his 1946 acquisition of citizenship in the new Philippine nation. He was aware that by operation of law he had become a citizen of the Philippines, but he was not aware that he also had retained United States citizenship.

Later, appellant's father died and his American born mother returned to the United States, repatriating herself here. In 1952 appellant sought to visit his mother in Philadelphia and to that end applied in the Philippines for a Philippine passport. Part of the prescribed application for such a passport is a dec-

laration under oath that the applicant " * * * will support and defend the Constitution of the Philippine Islands from enemies, foreign and domestic * * * [and] will bear true faith and allegiance to the same. * * * " Appellant executed this prescribed form, obtained a Philippine passport and used it to come to the United States. Thereafter he learned of his dual citizenship, but too late, in the view of the Secretary of State and the court below, to prevent the oath he took in support of his passport application from causing him to forfeit his United States citizenship under the terms of Section 401(b) of the Nationality Act of 1940.

Section 401, 8 U.S.C. 1946 ed. § 801, provides in part as follows:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"(a) Obtaining naturalization in a foreign state, * * *; or

"(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; or

"(d) Accepting, or performing the duties of, any office, post, or employment under the government of a foreign state or political subdivision thereof for which only nationals of such state are eligible; * * *."[1]

In decisions handed down March 31, 1958, the Supreme Court has currently come to grips with certain constitutional problems, and some others as well, which Section 401 creates. Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568; Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590; Nishikawa v. Dulles, 356 U.S. 129, 78 S.

---

1. This section was superseded in 1952. 66 Stat. 280. The superseding sections of the 1952 Act treat loss of citizenship by persons with dual nationality as a separate and distinct problem. 66 Stat. 269, 8 U.S.C.A. §§ 1481, 1482.

Ct. 612. From these cases we learn that within reasonable limits, not yet precisely defined, Congress can make and has made a forfeiture of citizenship the legal consequence of voluntary conduct which, in legislative judgment, embarrasses our government in its international relationships. We are impressed that in the basic decision, Perez v. Brownell, supra, the opinion of the Court is at pains to point out "that Congress has interpreted this conduct [voting in a foreign election], not irrationally, as importing not only something less than complete and unswerving allegiance to the United States but also elements of an allegiance to another country in some measure, at least, inconsistent with American citizenship." 356 U.S. at pages 60–61, 78 S.Ct. at page 577. We think, therefore, that the Court has gone no further than to approve forfeiture of citizenship under Section 401 where the nature and circumstances of the allegedly expatriating conduct have been such as to indicate some flouting of obligations inherent in American citizenship, if not an implied renunciation of the tie.

█ Such restriction upon the reach of the expatriation statute is particularly important in dual citizenship cases which, in their nature, present special difficulties not present where the actor is a citizen of the United States only. The United States recognizes that a person may properly be simultaneously a citizen of this country and of another. Neither status in itself or in its necessary implications is deemed inconsistent with the other. " * * * The concept of dual citizenship recognizes that a person may have and exercise rights of nationality in two countries and be subject to the responsibilities of both. The mere fact that he asserts the rights of one citizenship does not without more mean that he renounces the other. * * * [D]ual citizenship * * * could not exist if the assertion of rights or the assumption of

liabilities of one were deemed inconsistent with the maintenance of the other." See Kawakita v. United States, 1952, 343 U.S. 717, at pages 723–724, 725, 72 S.Ct. 950, 956, 96 L.Ed. 1249. For present purposes the decisive point of all of this is that conduct merely declaratory of what one national aspect of dual citizenship necessarily connotes, cannot reasonably be construed as an act of renunciation of the other national aspect of the actor's dual status. Kawakita v. United States, supra; Lehmann v. Acheson, 3 Cir.1953, 206 F.2d 592.

What Jalbuena did in this case was to exercise a routine privilege of Philippine citizenship and, for that purpose, to follow prescribed normal procedure. Moreover, none of this clashed in any way with any responsibility of his American citizenship. For as a citizen of two countries he was entitled to travel documents from each country, bespeaking his national identification and the rights and privileges incidental thereto. It is not and could not reasonably be argued that the mere obtaining and using of a Philippine passport was in derogation of the American aspect of Jalbuena's dual citizenship. Kawakita v. United States, supra. And the form of oath he was required to execute as part of his passport application declared no more than his undertaking "to support and defend the Constitution of the Philippine Islands" and his "allegiance" to that fundamental law. Certainly this citizen of the Philippines, residing in that country, was bound loyally to support and defend the fundamental law of that land just as he would be bound in this country to support and defend our Constitution. Despite each obligation he may remain a citizen of the other country. Hence, merely to acknowledge and declare the Philippine obligation in a Philippine passport application cannot reasonably have significance in derogation or renunciation of birthright American citizenship.[2]

---

2. A great Secretary of State, later Mr. Chief Justice Hughes, stated his official view of this oath evaluation as follows:

"It is the spirit and meaning of the oath, and not merely the letter, which is to determine whether it results in ex-

It follows that, because nothing done by Jalbuena can fairly be viewed as a renunciation of the United States citizenship he enjoyed simultaneously with Philippine citizenship, Section 401(b) cannot properly be read as applying to his conduct.

The judgment will be reversed.

patriation. It is not a mere matter of words. The test seems to be the question whether the oath taken places the person taking it in complete subjection to the state to which it is taken, at least for the period of the contract, so that it is impossible for him to perform the obligations of citizenship to this country."

3 Hackworth, Digest of International Law, 1942, 219–220.