## MATTER OF Z—

### In DEPORTATION Proceedings

### A-8866185

### Decided by Board June 9, 1961

**Expatriation—Section 349(a)(4)(A), 1952 act—Economic duress.**

Where the record fails to refute respondent's testimony that his employment as a music teacher in the Israeli school system for a period of about one year (1956-57) was a matter of economic compulsion, the Government has failed to sustain its heavy burden of proving that his conduct was voluntary. Accordingly, a native-born United States citizen who under Israeli law acquired Israeli citizenship upon his arrival there as a Jewish immigrant in 1950, is held not to have expatriated himself under section 349(a)(4)(A) of the 1952 Act by reason of such employment.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Nonimmigrant, remained longer.

### BEFORE THE BOARD

DISCUSSION: The case comes forward upon certification by the special inquiry officer of his order dated February 13, 1961, directing that the deportation proceedings be terminated.

The respondent was born at Detroit, Michigan, on October 19, 1928. He went to Israel in October 1950, and last entered the United States at the port of New York on September 2, 1956, and was admitted as a transit nonimmigrant, authorized to remain in the United States for one day, upon presentation of an Israeli passport visaed for transit to Mexico. However, he has remained in the United States, claiming United States citizenship. The order to show cause charges that the respondent, although a native of the United States, became a citizen of Israel on July 14, 1952, and that he expatriated himself in 1956 under the provisions of section 349(a)(4) of the Immigration and Nationality Act by accepting employment as a teacher under the Israeli Ministry of Education and that he is subject to deportation as charged in the order to show cause. The primary issue is the alienage of the respondent.

The respondent was born a citizen of the United States in Detroit, Michigan. He is of the Jewish faith. He testified he left college after completing his first year to earn enough money to get married

329

and was married in August 1950. He stated he and his wife had been considering going to Israel to help in the development of the new state and in October 1950 the respondent went to Israel, his wife following in January 1951. His wife became pregnant in 1952 and their child was born in Israel in 1953.

The respondent testified that he went to Israel to see what it was like because it was a newly formed state, and perhaps to give them a helping hand in its formation, if possible, but that he did not go with the intention of remaining there permanently. He further stated that in 1952 he and his wife had decided to return to the United States but financial difficulties arose because of the illness of the child and of the respondent so that they remained on a cooperative farm where at least their immediate needs were supplied. The respondent's mother corroborated her son's testimony stating that he went to Israel to see what the country was like; that he had planned to go for several months before he did; that he remained there for a number of reasons, including illness, the pregnancy of his wife, the illness of his child and the lack of money to return; that she took a loan to help bring the respondent's wife and child home and the respondent remained there to earn money for his passage home.

The respondent testified that the employment situation in Israel was critical and jobs there were hard to find. After leaving the communal farm he obtained a job with the Haifa Port Authority in September 1959 as a laborer and a crane operator. He testified that in order to obtain the job with the Haifa Port Authority he was required to participate in the Port orchestra and in rehearsals two or three times a week. He testified that if it had not been for his musical background he would not have gotten a job and that his participation in the orchestra was a condition of his employment. Through a friend who knew about his musical background he obtained a job as a music teacher for seven or eight months for which he received about 170 Israeli pounds a month. The Israeli Ministry for Foreign Affairs states that the respondent was employed by the Ministry of Education and Culture as a music teacher from September 5, 1955, to August 31, 1956; that Israeli law does not require teachers to be Israeli citizens and allegiance to Israel is not required.

The respondent testified it was necessary for him to obtain work in order to support his wife and child; that he had no funds and did not want to appeal to his parents for financial assistance. This claim of employment under economic compulsion is not refuted by the record.

The Service's case for expatriation is predicated upon section 349 (a)(4)(A) of the Immigration and Nationality Act (8 U.S.C. 1481(a)(4)(A)) which provides in pertinent part:

330

* * * a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by— * * * accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof, if he has or acquires the nationality of such foreign state * * *.

According to a communication dated February 10, 1960, addressed to the American Vice Consul at Haifa, Israel, by the District Office for Immigration and Registration for Haifa, the respondent immigrated to Israel on October 16, 1950, on which date he was granted Israeli citizenship in accordance with section 2(b)(2) of the Israeli Nationality Law which states, "citizenship by return[1] is acquired by a person having come to Israel as an 'oleh' (a Jewish immigrant) after the establishment of the State with effect from the date of his immigration"; that, since then, the respondent is an Israeli citizen, and on April 22, 1956, he received an Israeli passport valid until April 22, 1958. For the purpose of discussion of possible expatriation under section 349(a)(4)(A) of the Immigration and Nationality Act, it will be assumed that the respondent had or acquired Israeli nationality at least from the viewpoint of the Israeli Government. Inasmuch as the respondent has established citizenship by birth in the United States, the burden of proof is upon the Government to prove that the respondent subsequently expatriated himself. That burden is a heavy one; the proof to establish loss of citizenship must be clear, unequivocal and convincing, not by a bare preponderance of evidence which leaves the issue in doubt.[2] The burden is upon the Government to establish that the expatriatory act was performed voluntarily.[3]

If the expatriating act is performed under duress, it follows that the act was not done voluntarily and will not result in loss of citizenship. The duress may take various forms and the law does not exact a crown of martyrdom as a condition of retaining citizenship.[4] "Economic duress" is a valid defense to expatriating conduct.[5] In the case of *Kenji Kamada et al.* v. *Dulles*, 145 F. Supp. 457, in which one of the plaintiffs (Tsume Sakamoto) was employed as a teacher

---

[1] The Law of Return of July 6, 1950 (the Hebrew year 5710) provides: 1. Every Jew has the right to come to this country as an "oleh" (a Jew immigrating to Israel permanently); 2(a) "Aliyah" (the immigration of a Jew into the Land of Israel) shall be by oleh's visa; 3(a) A Jew who comes to Israel and subsequent to his arrival expresses his desire to settle in Israel is entitled, while in Israel, to receive an oleh's certificate. *Laws Concerning Nationality*, United Nations Legislative Series (1954), page 263.

[2] *Nishikawa* v. *Dulles*, 356 U.S. 129; *Baumgartner* v. *United States*, 322 U.S. 665; *Schneiderman* v. *United States*, 320 U.S. 118.

[3] *Nishikawa* v. *Dulles, supra; Perez* v. *Brownell*, 356 U.S. 44; *Matter of G—*, 8—317.

[4] *Acheson* v. *Maenza*, 202 F.2d 453 (C.A. D.C., 1953).

[5] *Stipa* v. *Dulles*, 233 F.2d 551 (C.A. 3, 1956).

331

in Japan from 1941 to 1949 in primary schools operated by a Japanese municipality, it was held upon the facts that the plaintiff's service as a school teacher was a matter of economic compulsion and, hence, was not her free and voluntary act and did not constitute a cause of expatriation.[6]

Upon careful consideration of the evidence in the present case surrounding the circumstances of employment as a music teacher in Haifa, Israel, we find that the respondent was required to take such employment under the necessity of supporting himself, his wife and infant child, and that such employment as a school teacher was a matter of economic compulsion or economic duress such as would vitiate the expatriating effect of such an act. It, therefore, follows that expatriation under section 349(a)(4)(A) of the Immigration and Nationality Act has not been proved by the Government. Inasmuch as alienage has not been established, the proceedings must be terminated.

In view of the conclusion reached that alienage has not been established, we find it unnecessary to discuss other possible grounds of expatriation which have not been urged by the Government. We, however, find ourselves in general agreement with the conclusion of the special inquiry officer that expatriation has not been established under section 349(a)(1) or section 349(a)(10) of the Immigration and Nationality Act and we note that the Government does not urge expatriation on either of these grounds. As to the use of a passport, the respondent testified that this was the only way he could obtain a visa and also testified that his wife, although issued a United States passport, was also required to obtain an Israeli passport before she could depart from Israel. The respondent testified he was not required to take an oath of allegiance to Israel to obtain an Israeli passport, and the mere use of such a passport does not establish expatriation.[7] The order of the special inquiry officer terminating proceedings will be approved.

**ORDER:** It is ordered that the order of the special inquiry officer dated February 13, 1961, terminating proceedings be and the same is hereby approved.

---

[6] We find it unnecessary to rely upon the dictum in *Kenji Kamada v. Dulles, supra*, to the effect that teaching in a pubic school system operated by a foreign government or a political subdivision thereof was not the type of employment by a foreign government which was contemplated by the similar predecessor statute, section 401(d) of the Nationality Act of 1940.

[7] *Jalbuena v. Dulles*, 254 F.2d 379; *Rueff v. Brownell*, 116 F. Supp. 298.