MATTER OF H—

In EXCLUSION Proceedings

A-11679631

*Decided by Board August 28, 1961*

Expatriation—Dual national—Section 401, Nationality Act of 1940—Effect of action to retain Canadian nationality—Section 350, Immigration and Nationality Act—Benefits of foreign nationality—Canadian passport—Readmission to Canada as Canadian citizen.

(1) Dual national (at birth) of United States and Canada who acted to preserve Canadian nationality upon reaching his majority did not suffer loss of United States citizenship under section 401 of the Nationality Act of 1940 by renouncing United States citizenship before Canadian notary public, executing declaration of retention of Canadian nationality, and applying for Canadian certificate of citizenship. Performance of these acts was not the equivalent of a foreign naturalization, nor the equivalent of an oath of allegiance to Canada.

(2) Subject did not expatriate under doctrine that he elected Canadian nationality upon attaining his majority. Doctrine of election is inapplicable to person who is a dual national at birth.

(3) Benefit sought or claimed by subject in obtaining Canadian passport in 1959 did not cause expatriation under section 350 of the Immigration and Nationality Act when not followed by continuous three years' residence in Canada.

(4) Where subject would have been entitled to readmission to Canada as a long-term resident, even if he did not possess the citizenship of that country, benefits of Canadian nationality which he may have claimed upon his return to Canada after temporary visits to the United States were not sufficiently substantial to cause expatriation under section 350 of the Act.

EXCLUDABLE: Act of 1952—Section 212(a)(20) [8 U.S.C. 1182(a)(20)]—No immigrant visa.

### BEFORE THE BOARD

DISCUSSION: On January 15, 1960, a special inquiry officer ordered the applicant admitted as a citizen of the United States. At the request of the Service, we reopened the proceeding on September 23, 1960. On January 10, 1961, a special inquiry officer again ordered that the applicant be admitted to the United States at which time the case was certified to this Board for final action. In our decision dated March 14, 1961, we approved the special inquiry

411

officer's order. The case is now before us pursuant to the motion for reconsideration filed by the Service on April 7, 1961.

The applicant is a 30-year-old married male who was born at Detroit, Michigan, on March 23, 1931. At the age of about six months, his parents took him to Canada and he resided there until October 26, 1959, at which time he applied for admission to this country as a United States citizen, indicating his desire to take up permanent residence here. The applicant's parents were born in Canada and never became citizens of the United States. At birth, this applicant was a dual citizen of the United States and Canada. On August 1, 1952, a certificate of Canadian citizenship was issued to him.

We have carefully reviewed the entire record. The sole issue involved is whether the applicant is an alien who requires an immigrant visa or whether he is still a citizen of the United States. The question resolves itself into whether he became expatriated: (1) under section 401 of the Nationality Act of 1940 [8 U.S.C. 801, 1946 ed.], or (2) under section 350 of the Immigration and Nationality Act of 1952 [8 U.S.C. 1482].

We will first consider whether the applicant became expatriated under section 401 of the Nationality Act of 1940. Prior to the repeal of that statutory provision on December 24, 1952, the only possible expatriating acts performed by the applicant were those occurring in July 1952 in connection with his efforts to retain his Canadian nationality. Exhibit R-3 shows that under section 6(1) of the Canadian Citizenship Act, effective July 20, 1950, a person who was a Canadian citizen by·virtue of having been born abroad to a natural-born Canadian citizen father ceased to be a Canadian citizen upon the expiration of one year after reaching the age of 21, unless he made a declaration of retention of Canadian citizenship. If he was a citizen of a country other than Canada, he was required to file a declaration renouncing the nationality of that country. Exhibits 2 and R-3 contain letters of the Canadian Citizenship Registration Branch dated November 24, 1959, and July 8, 1960, showing that this applicant was not required under Canadian law to take an oath of allegiance to Canada. Exhibit R-1 establishes that the applicant executed a renunciation of his United States citizenship before a Canadian notary public and commissioner on July 23, 1952; that on the following day he executed a declaration of retention of Canadian citizenship; and that on August 1, 1952, a certificate of Canadian citizenship was issued to him.

Section 401 of the Nationality Act of 1940, as amended, sets forth in paragraphs (a) through (j) certain acts which resulted in the loss of United States nationality. Only paragraphs (a), (b) and (f) have any pertinence to the applicant's case. The appli-

412

cant's renunciation of United States citizenship in July 1952 did not cause his expatriation under section 401(f) of the Nationality Act of 1940 because that statutory provision required the making of a formal renunciation *"before a diplomatic or consular officer of the United States* in a foreign state." The record before us contains no evidence that the applicant obtained naturalization in a foreign state, nor that he took an oath of allegiance to Canada, nor that he made a formal declaration of allegiance to Canada, which acts would have caused expatriation under section 401(a) or (b) of the Nationality Act of 1940. Section 408 of that Act provided that the loss of nationality under the Act "shall result solely from the performance by a national of the acts or fulfillment of the conditions specified in this Act." In view of what we have said, it would seem that the applicant did not become expatriated under section 401 of the Nationality Act of 1940. However, the Service contends that the applicant did become expatriated under section 401(a) or (b). It relies on certain language which appears in *Kawakita* v. *United States*, 343 U.S. 717 (1952), and states that we misconstrued that decision although we had not even mentioned the case in our previous orders concerning the applicant.

We have carefully examined the *Kawakita* decision in the light of the argument of the Service. The Service asserted (motion, p. 2) that *Kawakita* "holds that a dual national, by affirming or reaffirming his foreign nationality by acts inconsistent with United States citizenship constitute a renunciation of United States citizenship and result in expatriation under section 401(a) and/or (b)." This assertion is not supported by the language (principally dictum) which the Service quoted from the *Kawakita* decision, nor was this the Court's ruling. What the Court actually held with respect to the issue of citizenship, was that the evidence was sufficient to support the finding of the jury that Kawakita had *not* renounced or lost his United States citizenship at the time he committed the acts referred to in the indictment (p. 727). At page 731 of the decision, the Court said: "* * * the major factual problem on the issue of expatriation revolved around the entry of petitioner's name in the Koseki." (The Koseki was a family census register.) Hence, the facts in *Kawakita* differ from those in this applicant's case. In any event, the ruling to the effect that Kawakita retained his United States citizenship does not appear to be of assistance to the view of the Service that this applicant did not.

In quoting from the *Kawakita* decision, the Service consistently underscored the words "renounced" and "renunciation" and aparently attributes some unusual significance to the Supreme Court's use of those words. Kawakita did not claim that he had renounced his United States citizenship under section 401(f) of the Nationality

Act, and the Supreme Court obviously used the word "renunciation" in its usual meaning of giving up or surrendering. In other words, a citizen could have renounced or surrendered his United States citizenship under section 401(a) of the Nationality Act by obtaining naturalization in a foreign state, or he could have done so under section 401(b) by taking an oath of allegiance to a foreign state.

Apparently the Service believes that the *Kawakita* decision enlarged section 401(a) and (b) of the Nationality Act to encompass some cases which were not actually included within its purview. The language of section 401(a) and (b) is clear and unambiguous, and the Supreme Court has referred to the recognized rule that when the words of a statute are free from doubt they are not to be added to or subtracted from by considerations drawn from any extraneous source. *Caminetti* v. *United States*, 242 U.S. 470, 490 (1917). This would be particularly true in a case such as that of this applicant where the attempted enlargement of the statute would extinguish the applicant's United States citizenship. The Supreme Court has said: "Rights of citizenship are not to be destroyed by an ambiguity." *Nishikawa* v. *Dulles*, 356 U.S. 129 (1958); *Kawakita* v. *United States, supra*, at page 728; and *Perkins* v. *Elg*, 307 U.S. 325, 337 (1939).

When the Supreme Court's discussion of whether Kawakita had become expatriated is considered in its entirety, we believe that the most that can be said for the theory of the Service is that, under other circumstances, Kawakita's signing of the Koseki might conceivably be the equivalent of naturalization within the meaning of section 401(a), or a declaration of allegiance to Japan within section 401(b). The Supreme Court did not suggest what circumstances would warrant a conclusion differing from the *Kawakita* decision, and we do not consider the *Kawakita* case to be of value in reaching a determination concerning the applicant. In connection with the statements in the motion as to what the Service believes was the ruling of the Supreme Court in the *Kawakita* case, we find no support in that decision for these statements of the Service.

In its motion, the Service raised two questions. The first is whether the acts performed by the applicant in July 1952 were the *equivalent* of a foreign naturalization or oath of allegiance, and the second is whether the applicant made an *election* between Canadian and United States citizenship.

With respect to the first matter, *Jalbuena* v. *Dulles*, 254 F.2d 379 (C.A. 3, 1958), has relevance although the Service says (motion, pp. 6–8) that it is lacking in precedent value because it fails to recite all facts and circumstances and does not distinguish *Savorgnan* v. *United States*, 338 U.S. 491 (1950). If the *Savorgnan* case had

had any applicability, it undoubtedly would have been discussed by the court. In connection with the question of whether the facts were stated in the *Jalbuena* case, that decision shows that he was born in the United States; that his parents took him to the Philippines as an infant; that he became a citizen of the Philippines by operation of law when that country became independent in 1946; and that in 1952 he made a declaration under oath that he would support and defend the Constitution of the Philippine Islands and bear true faith and allegiance to the same, this being part of his application for a Philippine passport. The Court of Appeals held that Jalbuena had done nothing which could be viewed as a renunciation of the United States citizenship which he enjoyed simultaneously with his Philippine citizenship, and that section 401(b) of the Nationality Act of 1940 could not properly be read as applying to his conduct. The Court of Appeals had considered the *Kawakita* decision and, assuming the correctness of the Service view as to the holding in *Kawakita*, it would seem that the Court of Appeals concluded that Jalbuena's act was also not the equivalent of a foreign oath of allegiance.

We will now consider whether the acts performed by the applicant in July 1952 were the equivalent of a foreign naturalization or oath of allegiance. The word "equivalent" has been defined as alike in significance or import, equal in value, and virtually, or in effect, identical. If the acts performed by the applicant were actually the equivalent of a naturalization in Canada or an oath of allegiance to Canada, it would seem that, in contemplation of law, expatriation would have occurred under section 401(a) or (b) of the Nationality Act by reason of the performance of the specific acts mentioned in these statutory provisions. With the exception, however, of a general statement that these acts of the applicant were the equivalent of a foreign naturalization or oath of allegiance, there is little in the motion of the Service to substantiate this assertion.

Insofar as concerns the question of whether the acts performed by the applicant in July 1952 were the equivalent of a foreign naturalization, this applicant has at all times been a citizen of Canada, and we do not believe it can be successfully urged that he could have obtained naturalization in a country of which he was already a citizen. With respect to the question of whether the acts were the equivalent of a foreign oath of allegiance, we have carefully examined the three pertinent documents contained in exhibit R-1. Obviously, the renunciation of United States citizenship dated July 23, 1952, and the petition for a certificate showing his Canadian citizenship cannot be considered the equivalent of an oath of allegiance to Canada. The third document merely sets forth

415

the applicant's desire to retain Canadian citizenship. It is clear from the record that there was a specific provision of Canadian law requiring a person who acquired Canadian citizenship by naturalization to take an oath of allegiance. On the other hand, the above-mentioned letters from the Canadian Citizenship Registration Branch dated November 24, 1959, and July 8, 1960, show that the applicant was *not* required to take an oath of allegiance to Canada. We conclude that the acts performed by the applicant in July 1952 were not the equivalent of a foreign naturalization nor the equivalent of an oath or other formal declaration of allegiance to Canada.

As we have indicated above, the second question raised by the Service was whether the applicant made an election between Canadian and United States citizenship. The important consideration in this connection is that this applicant, having acquired dual nationality at birth, was under no obligation to make an election between United States and Canadian nationality. This has been the settled administrative view since *Matter of R—*, 1—389 (1943), which involved a woman who was born in the United States but who also acquired German citizenship at birth through her parents. She had lived in Germany for 66 years. We held that she had not become expatriated although we said, at page 392 of that decision, that her entire history prior to 1938 showed that she had considered herself a German citizen and had acted as one. Nevertheless, we said that there was no duty upon her to elected between United States and German citizenship and that she could have lost her United States nationality only in a method provided by the Act of March 2, 1907. In *Matter of Z—*, 2—346, 347 (approved by Atty. Gen. 1945), we stated that the doctrine of election does not apply to one who acquired dual nationality at birth and we held that the applicant was a citizen of the United States even though, during the exclusion proceeding, he withdrew his claim to United States citizenship and said that he wished to be considered a national of Canada.

*Mandoli* v. *Acheson*, 344 U.S. 133 (1952), also involved a person who was a dual citizen at birth and the lower court had held that he elected between his dual citizenships in favor of Italy. The Supreme Court concluded that Mandoli had not lost his United States citizenship and said that such citizenship, conferred by the Constitution upon persons born in this country, "* * * is not to be withdrawn or extinguished by the courts except pursuant to a clear statutory mandate." That case was governed by the expatriation Act of March 2, 1907, but the Court stated that the Nationality Act of 1940, although not controlling, showed that Congress therein "refused to require a citizen by nativity to elect between dual citizenships upon reaching a majority."

A case analogous to that of the applicant is *Matter of L—*, 4—756 (1952), which was governed by the provisions of the Nationality Act of 1940 and related to a person who had become at birth a dual citizen of the United States and Canada. He applied for admission to the United States on March 16, 1951, at which time he claimed to be a Canadian national and evidently intended to abandon all claim to United States citizenship. He became 21 years of age on December 25, 1950, and the Canadian Government issued a certificate of citizenship to him on March 31, 1951. On June 4, 1951, the Service held that this man was a citizen of the United States. On February 4, 1952, he made a formal renunciation of his citizenship before an American consular officer and was, therefore, no longer a citizen of the United States when the case came before us on December 5, 1952. There, counsel urged that we find that United States citizenship had been terminated on a date earlier than February 4, 1952, by an election of Canadian citizenship. Our decision was to the effect that the doctrine of election had no applicability to a person who became a dual national at birth and that such a person could not divest himself of United States citizenship by electing a foreign nationality unless he performed one of the expatriating acts mentioned in the statute. We approved the finding of the Service dated June 4, 1951, that on that date this person was still a citizen of the United States. At pages 6 and 8 of its motion, the Service referred to this decision and stated that it rejected the case as authority to the extent that it is or may be inconsistent with *Kawakita* v. *United States, supra*. However, *Matter of L—* does not conflict with the *Kawakita* decision.

In view of the foregoing, we conclude that this applicant did not become expatriated under section 401 of the Nationality Act of 1940, and we will next consider whether expatriation occurred under section 350 of the Immigration and Nationality Act [8 U.S.C. 1482]. A preliminary observation is appropriate. In its discussion of possible expatriation under section 350, several statements were imputed to this Board which were actually the statements of the special inquiry officer. For example, the Service stated (motion, p. 12) that *Jalbuena* v. *Dulles, supra*, was cited by the Board but did not involve section 350. The special inquiry officer mentioned that case but it was not referred to in our previous orders. Our order of March 14, 1961, in this applicant's case approved the special inquiry officer's order of January 10, 1961, directing the applicant's admission to the United States as a citizen, but this does not mean that we approved each and every statement appearing in the decision of January 10, 1961.

The Service stated (motion, p. 10) that the three elements required by section 350 are: (1) dual nationality, (2) a benefit sought

417

or claimed from a foreign state, and (3) "Residence in the foreign state of which he is a national after the age of 21 and after December 24, 1952, for a continuous period of three years." It was then stated that the only element which is limited to prospective effect is residence. However, the Service is in error with respect to these statements. We have specifically held that expatriation does not take place under section 350 unless the benefits of the foreign nationality were sought or claimed after the effective date of the Immigration and Nationality Act (December 24, 1952) and unless, following such claim of benefits and subsequent to the individual's 22nd birthday, he resided in the foreign country for three years. *Matter of G—Q—*, 7—195 (1956); *Matter of J—*, 8—112 (1958).

Apparently the Service claims that the declaration of retention of Canadian citizenship was a claim of benefits of Canadian nationality within the purview of section 350 of the Immigration and Nationality Act. However, since this document was executed on July 24, 1952, prior to the effective date of section 350, it is not within the scope of that statutory provision for the reasons stated in *Matter of G—Q—* and *Matter of J—*, *supra*.

The Service stated that after the applicant's declaration of retention of Canadian citizenship in July 1952 he considered himself to be solely a Canadian citizen. That appears to be correct. As a matter of fact, when the applicant first appeared before the special inquiry officer on October 26, 1959, and was asked regarding the country of which he was a citizen, he answered, "As far as I know, Canada." We believe it is clear from the record that the applicant thought he had given up his United States citizenship in July 1952; that about October 1959, when he desired to enter the United States for permanent residence, he communicated with an American consular officer who informed him as to the documents required; that he applied for a Canadian passport at that time because this was one of the documents specified by the American consul; and that subsequently the American consular officer reached the conclusion that the applicant was still a citizen of the United States and referred him to the United States immigration office at the port of entry.

It was stated by the Service that each of five items set forth in its motion was a benefit sought or claimed which would cause expatriation under section 350, and that we had considered these to be trivial. Actually, we had not passed, nor do we now pass, upon whether these matters were or were not trivial.

Among the items to which the Service referred were the application for an immigrant visa and the application for Canadian passport. It is difficult to perceive how the application for a United

418

States immigrant visa can be considered seeking the benefit of Canadian nationality. There was, of course, no formal application for the immigrant visa. The applicant specifically stated that he never applied for a Canadian passport prior to the fall of 1959, and it appears that the application for passport and the application for the United States immigrant visa were both made about October 1959. Apparently the applicant has lived in the United States since at least February 11, 1960, and it seems probable that his residence in Canada (for the purposes of section 350) terminated in October 1959. In any event, he did not complete three years' residence in Canada subsequent to applying for the United States immigrant visa and the Canadian passport and these acts, therefore, did not cause expatriation under section 350 in accordance with our decisions in *Matter of C—Q—* and *Matter of J—, supra.*

Two other items mentioned by the Service were that the applicant claimed exemption from registration under the Selective Service Act and claimed exemption from filing United States income tax returns. Of course, the applicant did not actually make any claim of exemption. As we indicated above, he had assumed since July 1952 that he was no longer a citizen of the United States and he registered under the Selective Service Act about August 1960. He also stated at the hearing on November 23, 1960, that he had always filed Canadian income tax returns but had not filed a United States return yet because he had only been here about one year. Even if we assume that the applicant willfully violated the laws of the United States by reason of his failure to register at an earlier date under the Selective Service Act and his failure to file United States income tax returns, we do not understand how it can conceivably be argued that such violations of the laws of this country constituted seeking or claiming the benefits of Canadian nationality.

The remaining item mentioned by the Service was, "He has entered the United States as a Canadian visitor." The Service did not state when the entries occurred, but the record shows that subsequent to December 24, 1952, the applicant entered the United States about three times yearly. We conclude that the applicant was a citizen of the United States on the occasion of each of these entries and would have been entitled to enter the United States as a citizen, and that the entries into this country cannot be held to constitute the seeking or claiming of the benefits of Canadian nationality.

Insofar as concerns the question of whether the applicant sought or claimed the benefits of Canadian nationality in connection with his returns to Canada following these temporary visits to the United States, he stated that he thinks that on some occasions he showed his drivers license to the Canadian immigration officer and appar-

ently on other occasions he exhibited his Canadian citizenship certificate. He had lived in Canada since he was 6 or 8 months old, and following these temporary visits to the United States he re-entered Canada for the purpose of returning to his home there. Presumably, he would have been entitled to do so as a resident of Canada even if he had not possessed Canadian citizenship. Under the circumstances and in view of the decision in *Matter of R—S—*, 7—718 (1958), we do not consider that the benefits of Canadian nationality which may have been claimed upon his returns to that country were sufficiently substantial to cause expatriation under section 350.

Since the applicant has shown that he acquired United States citizenship at birth, the Government must establish expatriation by clear, convincing and unequivocal evidence. *Gonzales* v. *Landon*, 350 U.S. 920 (1955); *Nishikawa* v. *Dulles*, *supra*. In the *Nishikawa* decision, the court specifically stated that in expatriation cases, as well as those involving denaturalization, "* * * the facts and the law should be construed as far as is reasonably possible in favor of the citizen." For the reasons stated above, we conclude that it has not been established that this applicant became expatriated either under section 401 of the Nationality Act of 1940 or under section 350 of the Immigration and Nationality Act. Accordingly, the motion of the Service will be denied.

**ORDER:** It is ordered that the motion of the Service for reconsideration, except as reconsidered herein, be and the same is hereby denied.