**UNITED STATES of America, Plaintiff,**

v.

**William L. MATHESON, Executor of the Will of Dorothy Gould Burns, Deceased, Defendant.**

**William L. MATHESON, Executor of the Will of Dorothy Gould Burns, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. 73 Civ. 2011, 74 Civ. 2437.**

United States District Court, S. D. New York.

May 8, 1975.

---

Paul J. Curran, U. S. Atty., for plaintiff; by Mel. P. Barkan, Asst. U. S. Atty., of counsel.

Patterson, Belknap & Webb, New York City, for defendant; by Herbert H. Chaice, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

Both the plaintiff, the United States, and the defendant, William L. Matheson as executor of the estate of Dorothy Gould Burns, have moved for summary judgment in the first action by the government to recover an income tax refund of $10,790.99 made to Mrs. Burns' estate

(73 Civ. 2011). Additionally, the government has moved to consolidate a related case (*United States v. Matheson,* 74 Civ. 2437 (KTD)) in which Mr. Matheson, as executor, has challenged a determination by the Internal Revenue Service that the Burns estate is not entitled to refunds of close to $10,000 in gift taxes paid by Mrs. Burns in 1966, 1967 and 1968. Mr. Matheson's only objection to such a consolidation was on the grounds that he would be limited in discovery which he sought in the other suit. However, the document, a report from the Mexican Ministry of Foreign Relations, which was at the core of this objection has since been turned over by the government and Mr. Matheson's objection is therefore obviated.

Because the issues raised in the related action between the same parties are identical to those raised in the instant case, the motion to consolidate the two cases will be granted, and my ruling on the motions for summary judgment will be dispositive of both cases. It is also noteworthy that a proceeding brought by Mr. Matheson in the United States Tax Court to challenge the Internal Revenue's assessment against Mrs. Burns' estate of approximately 3½ million dollars in estate tax deficiencies has been stayed pending the outcome of the cases at hand.

The basis on which the income tax refund was made and other tax refunds have been claimed is that Mrs. Burns allegedly expatriated herself from the United States in 1944. The underlying facts are not materially disputed.

Dorothy Gould Burns, born in 1904 in the United States, lived abroad in Europe from 1919 to 1941 during which time she married a Swiss nobleman and bore with him two daughters. When that marriage did not work out in 1934 Mrs. Burns, whose 1919 passport had expired, returned briefly to the United States on the basis of an affidavit in lieu of passport issued by the American Consulate in Paris, France. Her application for a passport was rejected and Mrs. Burns was apparently incorrectly informed that her marriage and extended residence abroad constituted presumptive loss of U. S. citizenship which could be regained only by naturalization. She did not undertake such naturalization proceedings and returned to Europe where in 1936 she was divorced from the Swiss nobleman. Thereafter, she lived abroad and used another affidavit in lieu of a passport in her travels until 1940 when she sought to leave Europe. The German invasion of France had prompted Mrs. Burns' departure, but she was denied entry into Portugal (her intended point of departure) because she lacked a passport. The Department of State, through the American Consulate in Spain, then granted Mrs. Burns' application for a passport for the limited purpose of passing through Spain and Portugal to the United States. The passport expired in November, 1940. In the year 1941 Mrs. Burns left the United States for Cuba where she met Mr. Burns, a native Mexican of Scottish ancestry, who was to become her second husband. In 1942 the two went to Mexico where in May, 1944, they were married. A third daughter was born to Mrs. Burns of this marriage. In December, 1944 Mrs. Burns executed an application for a certificate of Mexican nationality. The certificate was granted.

It is the execution of this application for a certificate of Mexican nationality which the executor claims expatriated Mrs. Burns from the United States. The government on the other hand contends that the application was not expatriating either in fact or in Mrs. Burns subjective intent. Moreover, the government argues that the estate is estopped from claiming such an expatriation.

The actual application for a certificate of nationality will be discussed infra; however, the events following the execution of the 1944 application are essential to an understanding of the various claims and will be reviewed first.

In 1946, Mrs. Burns applied to the Mexican government for the immigration of her oldest daughter, Rolande, as the daughter of a Mexican national.

In 1947 Mrs. Burns, although in possession of a Mexican passport, applied for a United States passport. In this application, she made no mention of her application for a certificate of Mexican nationality and misstated her husband's citizenship as British, rather than Mexican. The passport was granted and repeatedly renewed, even after Mrs. Burns revealed that her husband was, in fact, a Mexican and after the State Department, on investigation, learned that Mrs. Burns had been issued a certificate of Mexican nationality.

In 1953 apparently Mrs. Burns went to France to visit her ailing father. She remained in France for the rest of her life, becoming in 1956, the year of her father's death, a permanent resident of France. Mrs. Burns died in 1969. After the death of Mrs. Burns, the executor of her estate learned of her 1944 application for a certificate of Mexican nationality and based upon it filed claims for refunds of income and gift taxes for the years 1966–1968 and for an overpayment of estimated taxes in 1969.

The lawsuits consolidated herein were brought (1) by the government to recover the refund of 1966 income tax (refunds made for 1967 and 1968 have not yet been challenged by the government) and (2) by the executor to recover gift taxes for 1966, 1967 and 1968. As noted above, a proceeding by the executor in the Tax Court challenging the assessment of an estate tax deficiency of approximately 3½ million dollars has been stayed pending the determination of this case since the identical issues are involved in both.

The application for a certificate of nationality which is at the center of this controversy was executed by Mrs. Burns in 1944. It was prepared in Spanish by a Mexican attorney, Francisco Liguori, and reads in pertinent part:

"I herewith formally declare my allegience, obedience and submission to the laws and authorities of the Republic of Mexico; I expressly renounce all protection foreign to said laws and authorities and any right which treaties or international law grant to foreigners, expressly furthermore agreeing not to invoke with respect to the government of the Republic any right inherent in my nationality of origin." (From a translation certified as accurate by the Lawyer's & Merchant's Translation Bureau).

The executor of Mrs. Burns' estate repeatedly characterizes this declaration as a renunciation of American citizenship. Both the government and the executor devote a substantial portion of their most exhaustive briefs to arguing whether this declaration was, in 1944, required by Mexican law.

Mexico's Nationality and Naturalization Law, Article 2, as I find it, was amended as of December 31, 1949 to explicitly require of an alien marrying a Mexican a renunciation of other citizenships and a protest of allegiance to Mexico. According to Mr. Matheson, this amendment was simply a codification of a pre-existing requirement. It is his position that women marrying Mexican citizens did not become Mexican citizens themselves until they became naturalized by applying for and receiving a certificate of nationality.

The government contends that such women became Mexican citizens by operation of law upon contracting a valid marriage with a Mexican citizen. Such declarations of allegiance were, in the government's view, purely administrative requirements of the Mexican Foreign Ministry, not dictated by law.

The significance of the differing interpretations of the Mexican law is that if citizenship were not acquired automatically upon marriage, then the oath was undertaken to procure citizenship and may indicate an intention to abandon United States citizenship. If, however,

Mrs. Burns became a Mexican citizen immediately upon marriage, then her application for a certificate of nationality can be seen as a routine act of a dual citizen availing herself of a prerogative of her Mexican nationality. See *Kawakita v. United States*, 343 U.S. 717, 72 S. Ct. 950, 96 L.Ed. 1249 (1952); *Jalbuena v. Dulles*, 254 F.2d 379 (2d Cir. 1958).

The arguments developed by the parties as to whether the 1949 law merely restated or changed existing law are both very persuasive. However, a close reading of the pre-amendment statute indicates that even if it was necessary under the old law to apply for a certificate of naturalization, the oath required was merely an oath of allegiance to Mexico, not an explicit renunciation of one's former country as required by the 1949 amendment. As such, the intent of the declarant, in this case Mrs. Burns, in making the oath is not explicit on the face of the application. This is true because an oath expressly renouncing United States citizenship, as is required by the 1949 amendment would leave no room for ambiguity as to the intent of the applicant. However, an oath of allegiance to Mexico, without more, by one believing herself already a Mexican citizen by virtue of marriage, could be merely descriptive of her status as a dual citizen of both Mexico and the United States. See *Kawakita v. United States*, 343 U.S. 717, 72 S.Ct. 950, 96 L. Ed. 1249 (1952); *Jalbuena v. Dulles*, 254 F.2d 379 (3d Cir. 1958); *Tanaka v. I. N. S.*, 346 F.2d 438, 448 (2d Cir. 1965) (Kaufman, J., dissenting).

In fact, the oath taken by Mrs. Burns contained just such a declaration of allegiance to Mexico, but contained no renunciation of her United States citizenship. The only language which is even susceptible of misinterpretation as a "renunciation" of United States citizenship is that portion of the declaration in which Mrs. Burns:

"renounc[ed] all protection foreign to said laws and authorities [the laws and authorities of Mexico] and any right which treaties or international law grant to foreigners, expressly furthermore agreeing not to invoke with respect to the government of the Republic any right inherent in my nationality of origin."

However, it is a recognized fact of international law that a dual national is never entitled to invoke the protection or assistance of one of the two countries while within the other country. See *Nishikawa v. United States*, 356 U.S. 129, 132, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958); *Kawakita v. United States*, 343 U.S. 717, 733, 72 S.Ct. 950, 96 L.Ed. 1249 (1952). Thus, by that part of the declaration Mrs. Burns forfeited no rights as an American if in fact she believed herself to be a dual national. In fact, the language quoted above tracks the language of the pre-1949 statute (Article 17 of the Mexican Nationality and Naturalization Law) which was altered by the December 31, 1949 law to require an express renunciation of the declarant's nationality of origin.

It becomes, then, crucial to look to Mrs. Burns' intent in executing the application for a certificate of nationality. An oath of allegiance to another sovereign will not be construed as expatriating without proof of subjective intent to renounce United States citizenship. See *Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967); *King v. Rogers*, 463 F.2d 1188 (9th Cir. 1972); *Tanaka v. I. N. S.*, 346 F.2d 438, 448 (2d Cir. 1965).

On the question of Mrs. Burns' subjective intent in applying for the certificate of nationality there is considerable evidence that she believed herself to be a dual citizen of the United States by birth and of Mexico automatically by marriage. Mrs. Burns' attorney at the time of the application, Francisco Liguori, stated in his deposition that upon marriage she became a Mexican "as a matter of law" and that the certificate was merely a recognition of that fact by the ministry of Foreign Relations. In numerous documents, including a 1953

1246

application for a United States passport, Mrs. Burns reiterated the fact that her Mexican citizenship existed by virtue of her marriage to a Mexican. The certificate of nationality itself recites that "she acquired the Mexican nationality as of the date of her marriage." Even Mr. Matheson's first affidavit in support of the motion for summary judgment contains an admission that upon her marriage Mrs. Burns became a Mexican citizen, although he later argues that such a theory is unknown to Mexican law. The fact that Mrs. Burns had, years earlier, been erroneously informed that she had lost her U. S. citizenship by virtue of her marriage to a Swiss Baron is irrelevant since she had subsequently applied for and received a United States passport.

It is clear from the record that Mrs. Burns applied for the certificate (1) so that her daughter, Rolande, could immigrate to Mexico as a preferred immigrant with a Mexican parent and (2) in order to obtain a passport since a Mexican citizen could neither leave nor enter the country without one, and a certificate was necessary for the acquisition of a passport.

There is also considerable argument by the parties about Mrs. Burns' facility in the Spanish language and thus her understanding of the oath. However, her executor's insistence that she was fluent in Spanish is accepted. This being so, Mrs. Burns must have understood that the words in the oath, as discussed above, contained no renunciation of her United States citizenship. For this reason the oath will speak for itself since, as Mr. Matheson himself argues, she was bound by the contents of a document she signed. The oath itself overcomes the ambiguous testimony of Francisco Liguori at his deposition. According to Mr. Matheson's understanding of the testimony, Liguori told Mrs. Burns some 30 years ago that by executing the application for a certificate, she was renouncing her American citizenship. It is unclear that this was, in fact, what

Liguori said to Mrs. Burns. Rather, his testimony must be read as saying that he merely restated the oath to Mrs. Burns, explaining that she was forfeiting the protection of all foreign countries against Mexico.

Mr. Matheson cites numerous cases in which American citizens lost their American citizenship by becoming naturalized citizens of other countries. See, e. g., Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287 (1950); King v. Rogers, 463 F.2d 1188 (9th Cir. 1972). However, in Savorgnan, which was incidentally pre-Afroyim, the individual explicitly renounced her United States citizenship as a precondition of her naturalization as an Italian citizen. Likewise in King, the plaintiff demonstrated that he had the requisite intent for loss of citizenship when he became a British subject and informed the American Consulate that he was willing to make a formal renunciation.

These cases are clearly distinguishable from Mrs. Burns' case in which there was no explicit renunciation; the subjective intent to expatriate herself was lacking; and her citizenship was apparently by operation of law—not by naturalization undertaken by Mrs. Burns. To be sure the Mexican law speaks of women marrying Mexicans as naturalized Mexican citizens; but this is a semantic argument. The weight of the proof indicates that Mrs. Burns acquired Mexican citizenship upon marriage and that the application for and issuance of the certificate constituted an additional formality executed for, as the certificate itself states, "legal use which may be convenient. . . ." This was no renunciation process as in the cases cited above.

Finally, on the question of intent, the subsequent acts of the now deceased Mrs. Burns have to be probative. See Kawakita v. United States, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952) wherein a single application for a U. S. passport after the allegedly expatriating

act was considered on the question of intent. After applying for and receiving a certificate of Mexican nationality, Mrs. Burns repeatedly applied for and received United States passports; paid United States income and gift taxes as a citizen; represented to French authorities that she was an American citizen; and even sailed a pleasure boat under an American flag and a license issued upon her certification that she was a citizen of the United States. Certainly, all of these actions are consistent with and compel the conclusion that Mrs. Burns intended to remain and believed herself to be a United States citizen.

 The executor argues that Mrs. Burns did not believe herself to be a United States citizen. Desiring the comfort and convenience of travelling on an American passport, she allegedly lied in her passport applications by representing herself as an American citizen and, in one application, representing her husband to be a British, rather than a Mexican subject. Moreover, the executor argues that such a misstatement taints the credibility of her other representations in applications for United States passports. If this is true, then the government must succeed on its alternative theory of equitable estoppel. The executor of Mrs. Burns' estate stands in the same position as the deceased would were she a party to this litigation. See *Simons v. United States,* 333 F.Supp. 855 (S.D.N.Y.) aff'd on other grounds, 452 F.2d 1110 (2d Cir. 1971); *Kurz v. United States,* 156 F. Supp. 99 (S.D.N.Y.), aff'd 254 F.2d 811 (2d Cir. 1957). Mrs. Burns' repeated lies (accepting arguendo that characterization of her statements) to the government that she was an American citizen, estop her estate from now claiming that she was not an American citizen, and that her income and gift taxes should be refunded.

The executor attempts to counter that an estoppel argument is unavailable to the government since it neither relied on Mrs. Burns' misstatements nor suffered any detriment. This contention of no reliance is based on the fact that the government eventually learned that Mrs. Burns had been issued a certificate of nationality and knew that it was the policy of the Mexican government to require an oath of the applicant before issuing such a certificate. However, the United States government consistently believed, and there is a multitude of documentary evidence on this, that, despite any subsequent conflict in the interpretation of Mexican law, such an oath was an administrative requirement not to be construed as expatriating. This being so, the knowledge that the certificate had been issued in no way precluded the government's reliance on the representations of Mrs. Burns that she was an American citizen.

 As to whether the government suffered any detriment, the issuance of United States passports and licenses based upon fraudulent representations must clearly be seen as detrimental reliance which will support an estoppel. See *Simons v. United States,* 333 F. Supp. 855 (S.D.N.Y.), aff'd on other grounds, 452 F.2d 1110 (2d Cir. 1971). The contention by the executor that it was the United States which, by the receipt of Mrs. Burns' taxes, was unjustly enriched merits no comment. As was said by Mr. Justice Douglas in *Kawakita, supra,* "He cannot turn it [American citizenship] into a fair-weather citizenship . . ." 343 U.S. at 736, 72 S. Ct. at 962.

There being no disputed material facts, either of the two theories set out above supports an award of summary judgment in favor of the United States. Either the oath did not constitute a renunciation by Mrs. Burns of her American citizenship and she was a dual national, or her conduct in misrepresenting herself as an American citizen estops the executor of her estate from claiming otherwise. It is unnecessary to reach the merits of the government's collateral estoppel argument.