**KASUMI NAKASHIMA v. ACHESON,**
Secretary of State.

No. 10527–WB.

United States District Court
S. D. California, C. D.
June 22, 1951.

A. L. Wirin and Fred Okrand, Los Angeles, Cal., for plaintiff.

Ernest A. Tolin, U. S. Atty. Clyde C. Downing, Asst. U. S. Atty., Chief Civil Division; Arline Martin, Asst. U. S. Atty. all of Los Angeles, Cal., for defendant.

BYRNE, District Judge.

Plaintiff seeks a judgment declaring her to be a national of the United States in a proceeding under Section 903, Title 8, United States Code Annotated. Born in the United States on September 25, 1925, plaintiff went to Japan in February, 1941, where she attended high school. In 1947 she applied to the United States consul in Japan for registration as a national of the United States. Her application was denied on the ground that she had lost her United States nationality by voting in a Japanese election in 1946.

12

■ Section 401(e) of the Nationality Act of 1940, 8 U.S.C.A. 801(e) provides: "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * * (e) voting in a political election in a foreign state * * *."

Whether the 1946 Japanese election was a political election in a foreign state is no longer open to question in this circuit. It was decided in the affirmative on June 14, 1951 in the case of Dean Acheson v. Kuniyuki, 9 Cir., 189 F.2d 741. The plaintiff concedes that she voted in the election, but asserts she did not know that she would lose her nationality and did not so intend. Knowledge and intent are immaterial. The overt acts enumerated in Section 401(e) are stated objectively and the effect of the specified acts, when voluntarily done, is not conditioned on the undisclosed intent of the person doing them. Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287. That leaves but one question for determination: whether her act was voluntary. Dos Reis ex rel. Camara v. Nicholls, 1 Cir., 161 F.2d 860.

■ A voluntary act is an act proceeding from one's own choice or full consent unimpelled by another's influence. To determine whether an act is voluntary, the trier of fact must examine all relevant facts and circumstances which might cause the actor to depart from the exercise of free choice and respond to compulsion from others. In these Japanese voting cases, the conditions, as well as the nature of the government existing in Japan at the time, are of great importance. The elections were ordered by General MacArthur under the new law guaranteeing the vote to women. An intensive campaign was conducted by the occupation authorities to stimulate participation in the elections and to encourage all the inhabitants to take part in the democratic process. Those who worked at cross purposes were considered to be in sympathy with the officials who had been purged by the occupation authorities. The radio pronounced that the world was watching the Japanese elections and that those who refrained from voting were enemies of the people.

■■ It seems incongruous that an act performed by a national under the mistaken belief that he is cooperating with this country should result in his expatriation. Yet, that result is quite possible under Section 401(e) of the Nationality Act. When Congress adopted the Act, it was reasonable to believe that a person who participated in the political affairs of a foreign state by voting in a political election thereby manifested an attachment and allegiance inconsistent with allegiance to the United States. In effect, the performance of the specific act, if voluntarily done, raises a *conclusive* presumption that the national has evinced a conscious desire to expatriate himself. But Congress did not envision a situation where the foreign state would be occupied and supervised by this nation under such conditions as existed in Japan during the period here involved. If a national of this country residing temporarily in Japan participates in a Japanese election, motivated solely by a desire to cooperate with the United States, he is automatically expatriated. He has performed the overt act voluntarily. Apparently the occupation authorities made no concerted effort until 1947 to inform the Nisei with dual nationality of the result which would follow participation in the elections, and many voted freely and voluntarily under the impression that General MacArthur had called upon them to do so. They have lost their status as nationals of this country and are beyond the help of the courts. Only Congress can rescue them from their plight.

But such a situation is distinguishable from the case at bar. Here the plaintiff voted because she feared the result if she refrained from voting. The occupation authorities were bringing intense pressure on the Japanese people in a laudable effort to induce them to participate in the democratic process and to exercise their right of suffrage. Her testimony discloses that she had the fixed purpose of returning to this country at the first opportunity and was fearful of any interference with her plans. It is true that she had a distorted view of the exhortations of the authorities, but that is understandable under the circumstances. These authorities held the key which could

open the gate to her homeland and she was concerned about displeasing them.

■■ The plaintiff further testified that she lived in a small community; that all in the community advocated cooperation with the occupation authorities; that they talked about each other; that she feared that if she failed to vote she would be talked about and ostracized. If the only effect on the plaintiff was her fear that she would be talked about and rendered socially unpopular, I should think her right to relief very dubious. But it is apparent from her testimony that the real effect of the occupation authorities' campaign and the conversations of her neighbors was to inculcate in her a fear that she would acquire a reputation of uncooperativeness and thereby endanger her opportunity to return to the United States by inviting the wrath of the authorities. The means of exercising duress is not limited to guns, clubs or physical threats. The fear of loss of access to one's country, like the fear of loss of a loved one, can be more coercive than the fear of physical violence. The plaintiff's act of voting was not of her own choice, it was impelled by the influence of those who stood in a position of authority and was not a voluntary act.

Plaintiff is requested to prepare findings accordingly.