Minoru **TANAKA**, Petitioner,

v.

**IMMIGRATION & NATURALIZATION SERVICE**, Respondent.

No. 398, Docket 27721.

United States Court of Appeals
Second Circuit.

Argued March 29, 1965.

Decided May 25, 1965.

Edward L. Dubroff, Brooklyn, N. Y. (Albert J. Geduldig, New York City, on the brief), for petitioner.

James G. Greilsheimer, Sp. Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, and Francis J. Lyons, Sp. Asst. U. S. Atty., New York City, on the brief), for respondent.

Before LUMBARD, Chief Judge, and SWAN and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge.

Minoru Tanaka petitions this court to transfer his petition for review, filed in this court pursuant to 8 U.S.C. § 1105a (a) (5), to the district court to determine whether he acted involuntarily in voting in the Japanese election of June 1950, as it is upon such a finding that the Immigration and Naturalization Service found that he has lost his American citizenship and thus is subject to deportation.[1]

After three days of hearings in 1960, the Special Hearing Officer found that Tanaka had voted in a Japanese political election in June 1950 and that this action was voluntary, and he concluded that he thereby lost his United States citizenship by reason of § 401(e) of the 1940 Nationality Act which was in effect at the time, 8 U.S.C. (1946 ed.) § 801(e).[2] The Board of Immigration Appeals affirmed this decision in all respects and dismissed Tanaka's appeal on November 23, 1960. On December 20, 1960 Tanaka brought a declaratory judgment action to review the order of deportation in the Southern District of New York and on July 23, 1962, the district court transferred the action to this court under the judicial review provisions of § 106 of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1105a, which became law on October 26, 1961. Act of September 26, 1961, 75 Stat. 651, 8 U.S.C. (Supp. V, 1959–1963) § 1105a.

Under § 106, a petition for review of a final order of deportation, if it is not frivolous,[3] shall first be considered by the court of appeals, and if that court determines, on the basis of the administrative record, that there exists a genuine issue of material fact, the proceedings are to be transferred to the district court. However, if the record leaves no factual issues to be resolved, the court of appeals is required to pass upon the issues presented in the petition.

On the record made before the Special Inquiry Officer, we find that no question of material fact is left unresolved and there is no need for proceedings before the district court. Reaching the merits

1. The Service also found that in any event Tanaka had lost his American citizenship under the presumption of voluntariness of § 349(b) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1481(b), (1), by voting in two Japanese elections in April 1953, because of the provisions of § 349(a) (5), 8 U.S.C. § 1481 (a) (5), and (2), by remaining in the employ of a Japanese government political subdivision after December 24, 1952, because of the provisions of § 349(a) (4), 8 U.S.C. § 1481(a) (4). As we are of the opinion that Tanaka lost his American citizenship under § 401(d) of the Nationality Act of 1940, 8 U.S.C. (1946 ed.) § 801(d), by voting in the 1950 Japanese election, we do not consider the questions under the 1952 Act or any facts relating thereto.

2. This provision was continued in force in the Immigration and Nationality Act of 1952. Act of June 27, 1952, § 349, 66 Stat. 267, 8 U.S.C. § 1481(a) (5).

3. The government concedes, and we agree, that this petition is not frivolous.

of Tanaka's petition, we find that the circumstances surrounding his voting in 1950 do not constitute duress, and that therefore the Board of Immigration Appeals correctly determined that Tanaka lost his American citizenship by voting in a foreign election.

The facts, almost all testified to by Tanaka, are not in dispute.[4]

Tanaka was born in New York City on March 29, 1923, of parents born in Japan. Thus at birth he was a citizen of the United States as well as of Japan. His mother took him to Japan when he was three years old and he resided there continuously for over 30 years. Tanaka attended Maiji University in Tokoyo for two years. He married a Japanese national in 1954 and his wife and their child are in Japan. He served in the Japanese Army from December 1, 1943 to October 30, 1944, when he was discharged because of illness. The Special Inquiry Officer concluded that this military service did not expatriate him as it was involuntary. See Nishikawa v. Dulles, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed. 2d 659 (1958). Likewise, his employment in a Japanese political subdivision from November 1946 to April 1955 [5] was held not to have expatriated Tanaka as the Service had not established that this was voluntary or that the position was one for which only Japanese nationals were eligible. After April 1955, he was employed as a newspaper correspondent.

Tanaka never made any claim in Japan that he was an American citizen until he applied to the United States Consul at Fokuoko, Japan, for a United States passport in 1954. His application was rejected because of his army service and his voting.

Tanaka entered the United States in February 1957 on a Japanese passport for a three-months' stay as a non-immigrant newspaper representative. Extensions of his stay were granted until May 1959. Thereafter Tanaka's departure pursuant to deportation orders was delayed until Congress, in April 1960, rejected a private bill to naturalize him. The deportation proceedings were reopened, on Tanaka's motion, and his claims that he was a United States citizen and that he had not expatriated himself were considered by the Special Inquiry Officer for the first time.

Tanaka testified that he first voted in 1946 or 1947 at a national election when elections were first held in Japan after World War II, and at every election thereafter, until 1956, including an election on June 4, 1950.[6] Tanaka, answering through an interpreter his counsel's question why he voted in the Japanese elections, said "I participated in the elections because I was afraid of what my neighbors thought if I didn't." He said he knew he was "under a close watch by the police" and that everyone in the community knew he had been born in the United States and that his father was living in the United States; he had to protect himself from suspicion and from possible danger. He also said he never told his neighbors he was an American citizen. In explaining what he meant by being under a "close watch," he said, "They might have thought that I may have some special privilege of some kind or something."

He testified that he lived in Saiki, a community of about 30,000, and he felt his neighbors were always watching him. Prior to voting the first time he received in the mail a numbered paper from the

---

4. For the purpose of this proceeding, the government accepts Tanaka's testimony as "a truthful and sincere account of the reasons underlying his decision to vote in the Japanese political election of June 4, 1950."

5. Tanaka was a tax clerk in the Treasury Department and later a clerk in the Wel-

fare Department of the Prefecture of Oita.

6. For reasons which are not clear, the Special Inquiry Officer held that Tanaka voted for the first time in the June 1950 election, apparently because Tanaka had so stated in an application for a United States passport which he executed in July 1954.

city authority where he lived which enabled him to vote. There was no testimony or claim that there was any compulsion to vote or that anyone checked up on those who did not vote, except that elementary school children were sent around to urge the non-voters to vote as the communities in Japan were competing for the highest rate of voting. He had never been threatened with violence by any of his neighbors and had never heard of anyone who had been assaulted solely because he didn't vote.

■■ It is not open to question that the voluntary act of voting in a foreign election in 1950 results in expatriation under § 401(e) of the Nationality Act of 1940, the constitutionality of this provision having been expressly affirmed in Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958). However, no conduct results in expatriation unless it is voluntary. Nishikawa v. Dulles, supra.

■■ Tanaka has shown that he was a United States citizen by reason of his birth. The burden then shifts to the government to prove the act of expatriation "by clear, convincing and unequivocal evidence." Nishikawa v. Dulles, supra, 356 U.S. at 133, 78 S.Ct. at 615. Tanaka's admissions that he voted in the 1950 election have discharged the government's burden. Tanaka is then obligated to come forward and adequately inject the issue of voluntariness. This is the test laid down by the Supreme Court in Nishikawa where it was held that the petitioner had "adequately injected the issue of voluntariness" by showing conscription into the Japanese army in March 1941, under penal sanctions for failure to obey.

■ In our view, taking Tanaka's testimony in the light most favorable to him, we find that he has not adequately injected the issue of involuntariness to require the government to come forward and introduce evidence on that issue. Tanaka was under no compulsion or sanction to vote in the 1950 election. Compare Nishikawa v. Dulles, supra. Fear of what one's neighbors might think does not supply the kind of involuntariness that the law recognizes or that Congress could possibly have had in mind. While he testified that there was considerable public sentiment in favor of voting by those who were eligible, he admitted that no official action was ever taken regarding those who did not vote, he never heard of anyone being assaulted in Japan after World War II solely because of failure to vote, and he was on good terms with his neighbors. In short, there was no evidence whatever that he had any reason to fear bodily harm or any form of oppression.

Other courts in considering whether a petitioner has come forward with enough evidence to put the government to its proof on the issue of involuntariness have required that, in addition to a showing of petitioner's subjective fear, he also must show some additional circumstances to justify his fear. In Nishikawa v. Dulles, supra, the conscription laws of Japan provided that justification for Nishikawa's fears. In Doreau v. Marshall, 170 F.2d 721 (3 Cir. 1948), the petitioner, in France during World War II and expecting a child, applied for French citizenship hoping to avoid the very real threat of internment as an American national; this act was found to be involuntary. Matter of G, 8 I. & N. Dec. 317 (1959), relied on by Tanaka, is a case where a dual national of Greece and the United States possessed a mistaken belief that he would be branded a communist and subjected to violence if he did not vote in a Greek election. He was able to show a prevailing mob atmosphere which was adequate to put the government to its proof. In cases involving voting in Japanese elections during the immediate post-war period, petitioners who were successful in maintaining their burden of going forward made a showing of specific pressures or threats. See, e. g., Takehara v. Dulles, 205 F.2d 560 (9 Cir. 1953); Serizawa v.

442

Dulles, 134 F.Supp. 713 (N.D.Calif.1955) and cases cited at 715.[7]

The petitioner must show something more than his own vague and groundless fears of what his neighbors would have thought had he not voted, especially where there was no basis whatever for believing that they might have applied any coercive measures as a result of his not voting. The act of voting in a foreign election—in this case a national election—is such an unequivocal act of expatriation—and generally so considered—that it cannot be explained away as being involuntary because of a feeling that one's neighbors would have disapproved if it had not been done. If this were to be enough to nullify acts of expatriation it would be almost impossible ever to prove that such an act was voluntary. We ought not to emasculate the clear mandate of Congress by the construction which the petitioner urges.

We find no genuine issue of material fact such as to require transfer to the district court for resolution, and we affirm the order of deportation.

KAUFMAN, Circuit Judge (dissenting).

Minoru Tanaka is being deprived of the precious right of American citizenship because he voted, bowing to community pressure and in fear of possible economic reprisals and other dangers, in a post-war Japanese election conducted under the aegis of our nation's occupation forces. I must dissent from the result, which I consider harsh under the circumstances, for when the proper burden of proof rules are applied to the rec-

ord evidence, there can be no doubt that the Government has failed to show the voluntariness of the alleged expatriating act "clearly, convincingly and unequivocally."

I.

"It is settled," the Supreme Court has said, "that no conduct results in expatriation unless the conduct is engaged in voluntarily." Nishikawa v. Dulles, 356 U.S. 129, 133, 78 S.Ct. 612, 615, 2 L.Ed.2d 659 (1958). My learned brothers, apparently accepting this well-established proposition, insist that Tanaka's testimony before the special inquiry officer did not adequately *inject* the issue of involuntariness and, therefore, it was not incumbent upon the Government to show that he voted voluntarily. They accept the Government's position that once the act of expatriation was established (by the uncontroverted evidence that he voted), Tanaka was obliged to come forward and make an adequate positive showing of duress in order properly to put the issue of voluntariness into the case.

With all respect, I believe application of these standards proceeds from a misreading of Nishikawa, supra. The Supreme Court, recognizing the drastic consequences of denationalization, accepted the view that "voluntariness is an element of the expatriating act, and as such must be proved by the Government." 356 U.S. at 134, 78 S.Ct. at 616. Nishikawa, the Court said, "adequately injected the issue of voluntariness" by showing that "he was conscripted in a totalitarian country to whose conscription law, with its penal sanctions, he was subject." 356

7. Passage of the Watkins Act, 68 Stat. 495, 496, July 20, 1954, 8 U.S.C. § 1438 note, which temporarily provided simplified naturalization procedures for certain persons who had lost their citizenship by voting in Japanese elections between September 2, 1945 and April 27, 1952, provides no support for Tanaka's claim of duress. Contra, Kamada v. Dulles, 145 F.Supp. 457, 461 (N.D.Calif. 1956); Serizawa v. Dulles, supra. The Act specifically recognized that those who voted in the election had lost their citizenship. The legislative history of the Act indicates that it was passed out of sympathy for those dual American-Japanese nationals who had responded to the call by General MacArthur and others to participate in Japanese political life, many of whom were unaware of the consequences to their American citizenship. Specifically disavowed was the assumption that many of these people had acted under compulsion. See 2 U.S.Code Cong. and Admin.News, pp. 2579, 2583 (1954).

U.S. at 136, 78 S.Ct. at 617. I do not read this language to mean that only allegations and proof of legal or physical compulsion suffice to put the Government to the burden of proving voluntariness.

That the majority in Nishikawa required little more from the petitioner than *pleading* the defense of involuntariness, coupled with minimal factual allegations, is strongly suggested by Mr. Justice Frankfurter's advocacy of a more restricted holding in his separate concurrence. He would have held, it appears, that where an individual engages in conduct "by command of a penal statute of another country to whose laws he is subject, * * * the Government should, * * * have the burden of proving by clear, convincing and unequivocal evidence that the citizen voluntarily performed an act causing expatriation," 356 U.S. at 141, 78 S.Ct. at 620, but would have avoided the question "[w]hether, in other classes of cases in which the defense of duress is asserted, the Government should have the burden of proving its absence." 356 U.S. at 142, 78 S.Ct. at 620. Indeed, in his dissent, Mr. Justice Harlan criticized the majority opinion, which he interpreted as altering, "in *all* denationalization cases," the rule that consciously performed acts are presumed voluntary, "by placing the burden of proving voluntariness on the

Government." 356 U.S. at 144, '78 S.Ct. at 621 (emphasis added).

I also note that the Board of Immigration Appeals, in this very case, viewed the burden of proof problem somewhat differently from the position now taken by the Government and my brothers. Relying on Nishikawa, the Board's acting chairman wrote that "since the respondent raised the issue of voluntariness, the Government must prove, by clear, convincing and unequivocal evidence, that this respondent's act of voting on June 4, 1950, was voluntarily performed." This was, in my view, a proper reading of Nishikawa, in which the Court rejected the rule that placed the burden of going forward to establish involuntariness on the citizen, Nishikawa v. Dulles, 235 F.2d 135 (9 Cir. 1956); Alata v. Dulles, 95 U.S.App.D.C. 182, 221 F.2d 52 (1955), and adopted instead the principle that conscription into the army of a foreign government of one holding *dual citizenship* is sufficient to establish prima facie that his entry and service were involuntary. Lehmann v. Acheson, 206 F.2d 592 (3 Cir. 1953).[1]

## II.

Turning to the evidence, as adduced before the Immigration Service's special inquiry officer, I have little doubt that Tanaka adequately "injected" and certainly "raised" the issue of voluntariness

---

1. The opinion for the majority suggests that, in order to put the Government to its proof on the issue of voluntariness, the citizen cannot show subjective fear alone, but must point to "some additional circumstances to justify his fear." But the cases cited for this proposition do not, on my reading, support it. As already indicated, Nishikawa enunciated a broad rule applicable whether or not the expatriating act was legally compelled by the foreign state. In Doreau v. Marshall, 170 F.2d 721 (3 Cir. 1948), the court rejected as premature the Government's contention that the facts alleged, even if accepted, did not amount in law to duress. And the test there framed —"extraordinary circumstances amounting to true duress," 170 F.2d at 724 —certainly does not apply after Nishikawa imposed an exceedingly oner-

ous burden of proof *on the Government*. See Kiyama v. Dulles, 268 F.2d 110 (9 Cir. 1959) (Government has burden of proving voluntariness). Finally, in Matter of G, 8 I. & N. Dec. 317 (1959), the Board of Immigration Appeals held that the issue of voluntariness was adequately injected by a genuine, *but unfounded*, fear of harm. Quoting from Nishikawa, 356 U.S. at 137–138, 78 S.Ct. 612, the Board wrote, "Nor can the district judge's disbelief of petitioner's story of his motives and fears fill the evidentiary gap [of affirmative evidence of voluntariness of the act] in the Government's case * * * [for] the Government must in each case prove voluntary conduct by clear, convincing and unequivocal evidence." 8 I. & N.Dec. at 321 n. 5.

sufficient to put the Government to its burden. Indeed, bearing in mind that "evidentiary ambiguities are not to be resolved against the citizen," Nishikawa v. Dulles, 356 U.S. at 136, 78 S.Ct. at 617, it is apparent that the Government has fallen far short of meeting the burden of establishing the voluntary character of Tanaka's actions. My brothers find no more than "vague and groundless fears of what his neighbors would have thought had he not voted," thus echoing the special inquiry officer's statement that Tanaka's "sole explanation is that as a native and citizen of the United States he was sensitive to the possibility of *disapproval* of his neighbors." This is, I submit, an over-simplified characterization of testimony which, I believe, established Tanaka's pervasive fear that he, as well as his family, might suffer, physically and economically, if Japanese neighbors who knew that he was an American citizen, with a father still living in the United States, also discovered that he was not voting in Japanese elections.

The background of fear begins after Tanaka's release from the army when he was twice interrogated at his home by the Japanese military police about communications with his father. The fact that the military police came was, to Tanaka, a "significant threat," and to avoid the suspicions of his neighbors, who discussed the purpose of the visit, he lied and said the police were simply seeking to ascertain the degree of his recovery from the illness which caused his discharge from the army.

Tanaka also explained, at the hearing, that any failure to vote would be noted by his watchful neighbors because

"the names on this voting register were checked and if you failed to vote they usually sent the elementary school children to urge them to vote because at that time all the communities in Japan were competing for the highest rate of voting. * * If I don't vote, the people in charge would send someone to my place so the whole neighborhood would know. * * * We lived in a small neighborhood, and anything like this, even the voice, would be heard, so they would know."

Initially, petitioner testified that he voted "because I was afraid of what my neighbors thought if I didn't." This vague explanation was, however, given greater substance during the course of the hearing. For example, after noting that he knew of one incident in which a Japanese man was "beaten up" for speaking favorably about the United States,[2] he added:

Everyone in the community knew that I was an American citizen and my father was living in this country, so that I had to protect myself from the suspicions *and from the possible danger.* (Emphasis added.)

Moreover, if Tanaka did not vote, he could not "tell what might happen as a consequence," but was afraid of those who would resort to physical reprisals of my family." And the testimony, and "the possible harm to the members which as my brothers concede should be taken in the light most favorable to Tanaka, also indicates that he feared the loss of his job with the prefectural government, whose officials could easily learn of his failure to vote on the occasions when he was given an absentee ballot. See Stipa v. Dulles, 233 F.2d 551 (3 Cir. 1956) (economic duress sufficient defense); Takehara v. Dulles, 205 F.2d 560 (9 Cir. 1953) (fear of loss of ration card); Takano v. Dulles, 116 F. Supp. 307 (D.Hawaii 1953).

2. The majority stresses Tanaka's admission that he never heard of anyone being assaulted in Japan after World War II *solely* because of failure to vote. I fail to see the importance of this because, in Tanaka's instance, the lack of interest in Japanese affairs that would be manifested by a failure to exercise the franchise, when conjoined with his neighbors' knowledge of his American nativity and citizenship, might well have provoked dangerous repercussions; at the very least, his situation differed from a case of "solely" failing to vote.

Furthermore, the Board of Immigration Appeals took an unnecessarily narrow view when it expressed inability to perceive "how voting or not voting in a Japanese election would indicate sympathy or antagonism toward the United States." This statement misconceives the relevant question, which is simply what Tanaka believed his neighbors would think *and do* if he failed to vote. In any event, Tanaka's position is understandable: If a person living in Japan were thought—relatively soon after the end of a bloody war with the United States—to have close ties with the United States, his failure to vote in a Japanese election in 1950 might be viewed as a lack of interest in Japanese affairs or even disloyalty to Japan and paramount allegiance to the United States. Let us suppose, by way of illustration, that a person living in the United States had dual American and German citizenship, with many relatives living in Germany. Surely, we would not be taxing credulity if we recognized some justification for his belief that he might be disdained by his neighbors and that some headstrong nationalist might do him physical harm if he did not vote in American elections relatively soon after our war with Germany ended. His disinterest in American elections expressed by his failure to vote, if it could be ascertained, might very well be interpreted as greater devotion to Germany and lack of fealty to the American democracy, particularly by those neighbors whose kin were killed or maimed in the war.

The record evidence in this case, moreover, should be read in the context of conditions in post-war Japan, as revealed in numerous court adjudications dealing with voting by dual Japanese-American nationals. We learn from these cases that, in the years immediately following surrender, an intensive campaign was conducted to stimulate participation in the democratic election process by all inhabitants of Japan. Furthermore, General MacArthur's headquarters, through press, radio and other communications media, constantly urged qualified persons to vote in order to promote democracy and local leaders, in turn, impressed upon everyone the need to participate in the elections. Radio broadcasts sounded the theme that the world was watching the Japanese elections and branded those who refrained from voting "enemies of the people." Indeed, the campaign stressing the function of voting was so powerful that many deemed it mandatory to vote, fearing reduction of rations and ostracism for failure to do so. Kamada v. Dulles, 145 F.Supp. 457, 461 (N.D.Cal. 1956). And the effect of this veritable wave of pressure, aimed at securing a large turnout at the polls, was particularly potent on a people whose minds and habits had, for almost three centuries, been trained to obey the will of a governing few. Akio Kuwahara v. Acheson, 96 F.Supp. 38 (S.D.Cal.1951). See also Hichino Uyeno v. Acheson, 96 F. Supp. 510 (W.D.Wash.1951); Kasumi Nakashima v. Acheson, 98 F.Supp. 11 (S.D.Cal.1951).

It has even been suggested by one court that Congress recognized the involuntary nature of the Japanese elections following the war and the contribution by persons such as Tanaka in helping implement United States policy by voting in those elections when it enacted the Watkins Act, 8 U.S.C. § 1438 note, providing for restoration of the citizenship of American-born Nisei who voted in occupied Japan. See Serizawa v. Dulles, 134 F.Supp. 713, 714 (N.D. Cal.1955). I do not pass judgment on the validity of that suggestion, see footnote 7 of majority opinion, but it does seem appropriate to quote from the legislative history, reflecting conditions in Japan during the occupation:

"[M]any persons genuinely concerned with the fate of that wartorn country sacrificed their United States citizenship to participate in the epic struggle waged at the polls. * * * The basic issue in the postwar elections was the pro-American policy of the Prime Minister in opposition to the Communists. * * Some who voted did so in the belief

that they were helping win the battle against the Communists in that crucial and strategic struggle which in Japan, at least, seems to have been resolved in favor of democracy and pro-Americanism." 1954 U.S.Code Cong. & Adm.News, pp. 2579, 2580.

In light of the evidence here, when viewed against the background of the prevailing climate outlined above, I am persuaded that the Government has failed to carry its burden and prove, by clear, convincing and unequivocal evidence, that Tanaka voluntarily voted in the June 4, 1950, election. Absent here is the requisite "solidity of proof which leaves no troubling doubt in deciding a question of such gravity as is implied in an attempt to reduce a person to the status of alien from that of citizen." Baumgartner v. United States, 322 U.S. 665, 670, 64 S.Ct. 1240, 1243, 88 L.Ed. 1525 (1944). The Government has failed to prove that Tanaka's act of voting was the conscious exercise of a free choice, made spontaneously and apart from the force of outside pressures. See Matter of G, 8 I. & N.Dec. 317, 319-20 (1959). That subjective motivations inducing the overt act are relevant cannot be doubted; for example, Mr. Justice Frankfurter, in Nishikawa v. Dulles, 356 U.S. at 140, 141, 78 S.Ct. at 619, recognized the difficulty the Government might encounter in attempting to establish the citizen's state of mind "as it bears on his will, purpose and choice of action—in short, 'voluntariness,'" and alluded to the "subtle, psychologic factors that bear on duress."

It is important to recognize, moreover, that the quantum of influence which removes actions from the sphere of free choice varies according to the character of the act. Thus, it would seem to me that a greater degree of proof of compulsion or coercion would be necessary to sustain a claim of involuntariness in connection with the positive acts of applying for and obtaining naturalization in a foreign state, 8 U.S.C. § 1481(a) (1), or serving in the armed forces of a foreign state, 8 U.S.C. § 1481(a) (3)—acts which

so clearly indicate a renunciation of American ties—than in the case of the much more equivocal act of voting in an election conducted under the aegis and urging of American occupation forces, as in this case. While it is true that the Government need not prove that a person, in order to be deprived of his citizenship, must intend or desire the result, Perez v. Brownell, 356 U.S. 44, 61, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), knowledge and intent are material elements in determining whether the act was voluntary.

Finally, even if I were to accept, *arguendo*, the majority's conclusion that there is no evidence that Tanaka "had any reason to fear bodily harm or any form of oppression," I cannot agree that his testimony concerning community pressure failed to inject the issue of voluntariness. Since the loss of the precious birthright of American citizenship is involved, I would, construing both the law and the facts "as far as is reasonably possible in favor of the citizen," Schneiderman v. United States, 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796 (1943), conclude that the Government has failed to carry its burden of proving that Tanaka voluntarily expatriated himself by voting in the June 6, 1950, election; and, this failure cannot be excused by a hypertechnical conclusion, reminiscent of the rigid formalities of common-law pleading, see Dioguardi v. Durning, 139 F.2d 774 (2 Cir. 1944), that the issue of involuntariness was not injected by Tanaka. The record is replete with evidence that he raised the point and that the Government had adequate notice of Tanaka's claim.

### III.

In any event, and as a minimal requirement, this case should be transferred to the District Court for a hearing *de novo*, 8 U.S.C. § 1105a(a) (5) (B), because—notwithstanding the Government's factual concessions—a genuine issue of material fact was presented as to Tanaka's nationality. It is always better for an appellate court to treat difficult questions of law, especially those

of constitutional dimension, after the facts have been fully developed and the issues refined by a trial judge. Indeed, summary judgment has, on occasion, been deemed inappropriate where a fuller record is thought to be an essential prerequisite to intelligent, informed resolution of complex questions of law. See Kennedy v. Silas Mason Co., 334 U.S. 249, 256–257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); Miller v. General Outdoor Advertising Co., 337 F.2d 944 (2 Cir. 1964). And the courts have often held that genuine issues of material fact exist, within the meaning of the summary judgment rule, where, as here, reasonable men differ about the inferences to be drawn from undisputed basic facts. See Empire Electronics Co. v. United States, 311 F.2d 175, 179 (2 Cir. 1962); S. J. Groves & Sons Co. v. Ohio Turnpike Comm., 315 F.2d 235, 237–238 (6 Cir.), cert. denied, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963).

Contrary to the Government's view, transfer to the District Court might well accomplish something more than the confirmation of the facts already conceded before us. There are many important gaps in the skimpy record which, in the majority's view, indicates that the issue of involuntariness has not been adequately injected but which, in my view, does not support a finding of voluntariness. To give but one example, it may not be clear what Tanaka meant when he said, "I had to protect myself from the suspicions and from the possible danger." I cannot be sure whether he meant mere fear of disfavor and economic reprisals, or physical attacks upon himself and his family. The Government's acceptance of Tanaka's testimony as "a truthful and sincere account of the reasons underlying his decision to vote in the Japanese political election of June 4, 1950," should not foreclose further inquiry on a matter of such great importance, which leaves me in doubt because of the record's ambiguity. I should note, too, that at the time the hearing was held before the special inquiry officer in 1960, the new judicial review procedures of Section 106 of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1105a, had not yet become law. Tanaka could reasonably assume that, in the event of an adverse decision by the Board of Immigration Appeals, further proof could be adduced in a *de novo* hearing before a District Court under the then prevailing procedures. The alternative course I suggest would not run counter to the Supreme Court's interpretation of Section 106 in Foti v. Immigration & Naturalization Service, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), for transfer would be utilized to assure an informed determination, and not as a dilatory tactic.

## IV.

Finally, I must express some reservation over the applicability of Section 401 (e) to this case. The expatriation-for-voting provision withstood constitutional attack in Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568 (1958), on the ground that Congress, as part of its power to regulate foreign relations, could denationalize American citizens for voting in foreign political elections because such activities might give rise to serious international embarrassment. Quite apart from the possibility that such embarrassment is most unlikely in an election conducted under the auspices of American occupation forces,[3] I question whether Section

3. Several courts have refused to apply Section 401(e) to "elections" conducted in countries occupied by American forces, holding that the citizen had not voted in a "political election" in a "foreign state" within the contemplation of the statute. See, e. g., Fujiko Furusho v. Acheson, 94 F.Supp. 1021 (D.Hawaii 1951) (Japan); Brehm v. Acheson, 90 F.Supp. 662 (S.D.Tex.1950) (Germany). Contra, Acheson v. Mariko Kuniyuki, 189 F.2d 741 (9 Cir. 1951), cert. denied, 342 U.S. 942, 72 S.Ct. 554, 96 L.Ed. 701 (1952).

The vitality of Perez v. Brownell itself is open to some doubt at this time. Last Term the Supreme Court, in Schneider v. Rusk, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964), struck down Section 352(a) (1), which provided that "[a] person who has become a national by naturalization shall lose his nationality by * * . * having a con-

401(e) should be read to cover the case of a dual national who voted in an election in the country of his second nationality. As Mr. Justice Frankfurter noted in Perez v. Brownell, 356 U.S. at 60, 78 S.Ct. at 577, "[s]pecific applications are of course open to judicial challenge, as are other general categories in the law, by a 'gradual process of judicial inclusion and exclusion.'" And Mr. Justice Whittaker's memorandum dissent, indicating that Section 401(e) would not apply if Perez were eligible, *as an alien,* to vote in Mexican elections, strongly suggests that the Court was not dealing with the peculiar situation of a dual national.

If Perez is no longer controlling, then I am inclined to read Jalbuena v. Dulles, 254 F.2d 379 (3 Cir. 1958), as good authority for the proposition that the expatriation statutes have limited application to dual nationals. See also Dulles v. Katamoto, 256 F.2d 545, 548–549. (9 Cir. 1958). Jalbuena was a natural-born citizen of the United States who moved to the Philippines and, by operation of law, became a Philippine citizen. His action in applying for and receiving a Philippine passport after subscribing to an oath to support the Philippine Constitution, it was held, did not constitute renunciation of his American citizenship; Jalbuena was not expatriated, under the predecessor of 8 U.S.C. § 1481 (a) (2), for taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state.

The Court of Appeals interpreted Perez as going no further

"than to approve forfeiture of citizenship under Section 401 where the nature and circumstances of the allegedly expatriating conduct have been such as to indicate some flouting of obligations inherent in American citizenship, if not an implied

tinuous residence for three years in * * * a foreign state * * * in which the place of his birth is situated." Since a conclusion in favor of the statute could have been sustained by reliance on Perez, at least one eminent

renunciation of the tie." 254 F.2d at 381.

I question whether Section 401(e) was designed to discourage dual nationality. Instead, should it not be construed in light of the Supreme Court's understanding of that concept, which

"recognizes that a person may have and exercise rights of nationality in two countries and be subject to the responsibilities of both. The mere fact that he asserts the rights of one citizenship does not without more mean that he renounces the other. * * * [D]ual citizenship * * * could not exist if the assertion of rights or the assumption of liabilities of one were deemed inconsistent with the maintenance of the other." Kawakita v. United States, 343 U.S. 717, 723–724, 725, 72 S.Ct. 950, 956, 96 L.Ed. 1249 (1952).

And from this recognition of the peculiar situation of the dual citizen, it follows that "conduct which is merely declaratory of what one national aspect of dual citizenship [such as taking an oath of allegiance or voting] necessarily connotes, cannot reasonably be construed as an act of renunciation of the other national aspect of the actor's dual status." 254 F.2d at 381. This reasoning seems to have validity. It is questionable, therefore, whether by the mere act of voting in Japanese elections as a national of Japan—even if that act was voluntarily performed—Tanaka, possessed of dual citizenship at the time, can be treated as having renounced his American citizenship within the meaning of Section 401(e). "[T]he dignity of citizenship which the Constitution confers as a birthright upon every person born within its protection is not to be withdrawn or extinguished by the courts except pursuant to a clear statutory mandate." Mandoli v. Acheson, 344 U.S. 133, 139, 73 S.Ct. 135, 138, 97 L.Ed. 146 (1952).

scholar has suggested that the Perez decision is "probably now moribund." Kurland, Foreward: "Equal in Origin and Equal in Title to the Legislative and Executive Branches of the Government," 78 Harv.L.Rev. 143, 174 (1964).