Joseph H. JOHNS, Plaintiff,

v.

INTERNATIONAL BUSINESS MA-
CHINES CORPORATION and IBM
Printing Systems, Inc., Defendants.

No. 03 CIV. 10197(CLB).

United States District Court,
S.D. New York.

March 1, 2005.

Order Amending Decision March 1, 2005.

 

David Feureisen, Bartels & Feureisen, LLP, White Plains, James M. Truss, Cox, Smith, Matthews, Inc., San Antonio, TX, for Plaintiff.

Zachary D. Fasman Paul, Hastings, Janofsky & Walker LLP, Allan S. Bloom Paul, Hastings, Janofsky & Walker LLP, New York, for Defendants.

### Memorandum & Order

BRIEANT, District Judge.

By motion filed October 25, 2004 (Docket #28), heard and fully submitted on December 17, 2004, defendant International Business Machines Corporation (IBM) moves for summary judgment in its favor pursuant to Fed.R.Civ.P. 56. Opposition papers were filed by Plaintiff on November 22, 2004 (Docket #38). Defendant filed reply papers on December 10, 2004 (Docket #39). Previously, on September 17, 2004, this Court heard oral argument on Plaintiff's motion to amend his complaint (Docket #25), and denied the motion orally from the bench (as being unnecessary). On September 17, 2004, the Court also dismissed on consent and with prejudice Plaintiff's Claim #1, which alleged age discrimination, leaving four claims: 1) Breach of Stock Option Agreement; 2) Breach of Employment Contract; 3) Fraud in the Inducement; and 4) Breach of Implied Covenant of Good Faith and Fair Dealing. While the case was filed initially as a federal question case, there is diversity jurisdiction.

The following facts are either undisputed or assumed favorably to the non-moving party. Plaintiff was offered a position as an executive of an IBM subsidiary by letter dated March 30, 1995, and was fired on September 20, 2002. When fired, Plaintiff was receiving a salary of $320,000.00 per year and had 29,765 stock options (24,014 were then exercisable), the value of which was then estimated to be $471,000. IBM

cancelled all the stock options upon its termination of Plaintiff.

The most substantive argument Plaintiff raises is that he was not terminated for just cause, and that cancellation of the stock options was therefore a breach of the stock option agreements, which set forth limited conditions upon which the options could be cancelled, including termination of employment for cause.[1] Plaintiff also alleged that he was fraudulently induced and that IBM breached an implied duty of good faith and fair dealing.

IBM contends that cancellation of the stock options was proper because plaintiff *was* an at-will employee who was terminated for cause after an internal investigation revealed that he deliberately violated IBM Business Conduct Guidelines (BCG's) when he authorized the printing in house at IBM of about 450 copies of Pine Brook Hills Homeowners' (PBH) Association directory at a direct cost to IBM of about $400, without proper prior authorization and inappropriately disregarded his assistant's expressed concerns about whether printing the directories might violate IBM policy. David Dobson[2], who became general manager of the Printing Systems Division of IBM in June 2001, relayed the following reasons for his decision to terminate Plaintiff: 1) The misuse of IBM assets for personal use without authorization; 2) Charging the cost of using the printing center to an IBM department code; 3) Plaintiff's [inappropriate] response to Lori Hand's emails concerning IBM policy; and 4) because Plaintiff wasn't truthful to the investigators when first confronted about

whether he'd been warned about IBM policy by Ms. Hand. *See* Bloom Decl. Ex. 4 (Dobson Dep. at 95–96).

Plaintiff asserts that the termination reasons offered by IBM are pretextual for actually terminating him for unjust causes, such as retaliation for whistle blowing. For example, Plaintiff states that he had for years expressed his concern with what he considered to be an inappropriate IBM practice of "channel stuffing," by which he claims IBM would entice customers (usually in the fourth quarter) to purchase at discount prices, what they might have bought later on with much higher profitability for stockholders.[3] He asserts further that the directories were a valid good will community donation by IBM, evidenced in part by the fact that each directory bore a legend identifying IBM as the donor, and further evidenced by the fact that the 2001 directories at issue were similar to those printed at IBM's expense in 1999, with which nobody at IBM apparently ever took issue.

Defendant supports its motion by arguing that Plaintiff's disagreement whether IBM had "cause" for terminating his employment is insufficient to sustain his claim for breach of the stock option agreements, because Plaintiff agreed in advance in writing that IBM had "sole discretion" to make all determinations regarding the cancellation of his stock options, and that the forfeiture-for-discharge provisions in the stock option agreements and plans were reasonable. Defendant also argues that Plaintiff's claims for breach of an employment contract have no merit under

---

1. The 1995 options may be cancelled if Plaintiff is discharged for any reason. The others require discharge for cause, or "violation of any rules, policies, procedures or guidelines of the Company."

2. Plaintiff reported to Dobson as a "second line manager" until Plaintiff's termination.

3. This common practice in American industry improves corporate performance for the current fiscal period at the expense of greater profits in the next accounting period, and makes management appear more successful than it otherwise would seem. In a specific case it may enhance incentive based compensation for managers.

common law principles and in light of his written acknowledgment that he was employed by IBM "at-will." Bloom Decl. Ex. 4 (IBM Employment Applic.). Finally, Defendant argues that Plaintiff's claim for breach of the covenant of good faith and fair dealing is duplicitous of his contract claims as a matter of law and does not provide independent grounds for relief.

Plaintiff argues that there are sufficient facts from which a jury could reasonably infer that IBM lacked cause to terminate him, or lacked a reasonable basis on which to believe it had cause. He also argues that he wasn't truly an "at-will" employee, based on the nature of his hiring (despite having signed an "at-will" employment agreement). Johns argues that when he was recruited and interviewed by IBM, he was told that his position would be very entrepreneurial, that he would enjoy a great deal of discretion in running his section of the business, that he'd be encouraged to engage in "straight talk" and to make candid assessments at IBM without fear of retaliation. Johns avers that he was told that if he performed well, he would receive financial support and autonomy within IBM.

With regard to printing the directories, Johns denies that he "initiated" or "authorized" the printing, and asserts that Frank Tanel (then print shop manager) actually authorized the project and directed Johns to make an internal cost transfer to Johns' department. Plaintiff also argues that as a senior level executive, he had authority to authorize the transfer of funds for printing the directories; that the cost of printing was minimal[4], and that IBM had previously printed the same directory without charge. In 1997, Plaintiff had applied to IBM for a grant on behalf of the Pine Brook Hills Fire Department and was directed to apply to IBM's Fund for Community Service (FCS). In 1999, Plaintiff again sought such a donation from IBM, and he filled out and faxed the appropriate forms according to the FCS Guidelines. Plaintiff claims that when he received a request in 2001 to update the Pine Brook directories, he directed that the request be made to Frank Tanel. Plaintiff also states that Frank Tanel requested that a cost transfer be made to Plaintiff's department, to which he agreed based on the process followed the previous time. He avers that his only involvement in the 2001 directory printing was limited to: 1) referring the Pine Brook Homeowner's Association to Frank Tanel; and 2) approving the cost transfer to Plaintiff's division after Frank Tanel decided to print the directories and requested the cost transfer to Plaintiff's division. Defendant, however, asserts that Tanel confirmed to the investigators that Plaintiff requested the printing and authorized it. Tanel was also fired for his part in the matter.

When Plaintiff asked his assistant, Mr. Hand, to process some details of the printing job, she expressed via email her concerns as follows:

> Joe, I have a concern with the Pine Brook Hills directory project. Although I am not certain about this, I do believe that IBM funding this sort of project without proper authorization might be a business conduct guidelines violation, and may also put the department at an audit risk. Again, I am not sure, but in order to be certain all are protected, I would be glad to run this by Business Controls for you while you are away.

---

**4.** IBM conceded at oral argument that the direct cost was only about $400. Adding administrative overhead and depreciation, a book cost of $4,344.50 is claimed which amounts to $10.22 per copy, an amount wildly in excess of what a job printer in the community would be expected to charge.

Please let me know how you would like me to proceed.

Def. Ex. 22.

Plaintiff's response (found in full at Defendant's Ex. 22), included the following somewhat arrogant excerpts:

"[L]ori, if you ask enough people inside [IBM] for permission or an opinion, you will always end up with a 'no'. . . . I have told you that we started this community support years ago . . . [IBM] has been a long-term supporter of the particular community through its fire department, which is a designated organization satisfying the [IBM] criteria because over the years, numerous [IBM] employees like myself have volunteered their time to support the organization. . . . [M]y choice to help fund them through my expense budget is my choice to make. [Y]ears ago, [I] made a decision to provide continuing support for what was provided by others before me. [I]t is fine that you question my decision, and is something that, generically [sic], [I] expect of my employees. . . . the amounts are immaterial, and well within the decision making levels of an executive. [I] intend to do what [I] long ago considered to be 'the right thing to do' instead of wasting valuable energy worrying about what rules MAY exist that COULD be in technical violation. . . ."

*Id.* Later that day, Plaintiff sent the following follow-up email message:

[S]aid "easier" after a more pleasant afternoon than was the morning: [I] already made the commitment, and intend to fulfill it. [W]e had nobody question the last time we did this, and an internal cost transfer will not be a source of interest for auditors. [W]e will just take the risk. [T]hanks . . . . . .

*Id.*

On July 30, 2002, about seven months after the event, Ms. Hand sent the following whistle blowing email to IBM's "Speak Up" program:

This report concerns an incident I encountered at the Production Center in the IBM Printing Systems Division, headquartered here in Boulder, Colorado. While working with the Production Center last year, I became aware that certain print jobs were being paid for "under the table." This practice, I was told, was not uncommon. One particular job was expensed internally to PSD at a cost of over $4,000. It should have been charged to an outside organization, Robert Hammang and Rich Hamilton, who work in the Production Center, may be willing to provide you with more information. My understanding is that Frank Tanel, who manages the Production Center, is responsible for the questionable activity. This practice may have been discontinued since I first became aware of it. I would like to remain anonymous. Thank you.

Bloom Decl., Ex. 24.

*Employment Contract*

■ The terms of Plaintiff's employment were set forth in a March 30, 1995 letter (Def. Ex. 2). Additionally, Plaintiff signed an employment application on April 4, 1995, which stated "IBM may terminate my employment for any reason, with or without cause, and I am free to terminate my employment at any time for any reason." (Def. Ex. 4). Contemporaneous oral blandishments and promises allegedly made when Plaintiff was hired cannot negate this written provision. It is clear as a matter of law that Plaintiff was an at-will employee. *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Accordingly, so much of the Complaint which claims breach of an employment contract must be dismissed.

*Stock Option Agreements*

Plaintiff received stock options as part of his incentive compensation each year from 1995 to 2001. Such options by their terms became exercisable after a future date. All but one of his award agreements specifically stated that the unexercised options could be cancelled if Plaintiff were terminated for cause or violation of corporate rules, policies, procedures or guidelines.

The internal complaint was assigned to Ms. Mary Palombi, a Corporate Audit Investigator with IBM's Internal Audit and Business Controls Department, who began an investigation in August 2002 targeting Mr. Tanel and Plaintiff. She was assisted by her supervisor, Vira Brock. Ms. Palombi sent an investigative report to Andrew Morton on September 19, 2002. Defendant contends that Plaintiff lied to the investigators, Ms. Brock and Ms. Palombi about whether he received a warning about whether printing the directories might be a violation of IBM policy. During his deposition, Plaintiff explained that he initially responded "no" to their questions because he did not initially remember the email from Ms. Hand. After they asked him and he responded "no," they showed him a copy of the email in which Ms. Hand had questioned Plaintiff about printing the directories. He testified that after they showed him the email he did remember it, although he didn't remember its exact contents (Johns Dep. at 346–47). Plaintiff told the investigators that "[b]ecause of the fact that their relationship was strained, [ ] he probably hadn't paid as much attention to [Ms. Hand's] warning as he should have." Def. Ex. 22, IBM Investigation Report.

Defendant argues that after his assistant warned him that his actions might violate IBM policy, Plaintiff's response that he would just "take the risk" may have proved costly to Plaintiff, but that a jury could not second-guess IBM's termination for cause on these facts, even though Plaintiff lost valuable stock options as a result of being terminated for cause. Defendant contends that summary judgment is proper because there is no question that Plaintiff's employment relationship with IBM was at all times "at-will" and that IBM's determination that he was fired "for cause" was reasonable in light of the facts known to IBM at the time of the decision as a result of reasonable investigation, and that the decision is therefore not subject to further review as a matter of law.

**Discussion**

■■ Our Court of Appeals has held that "under New York law . . . [a Corporation's] decision [regarding a classification of departing employee affecting his benefits] could be set aside by the court only if appellant could sustain the heavy burden of establishing that the challenged benefit decision was the result of bad faith, fraud, or arbitrary action." *Gehrhardt v. General Motors Corp.,* 581 F.2d 7, 11 (2d Cir. 1978). The case also holds that "Under this standard it is not enough to persuade a judge or jury that the decision may have been incorrect." If the decision is supported by a reasonable basis "(t)he court may not substitute its judgment for that of the [management] on the disputed factual issues[.]" *Id.* (emphasis added). Similarly in *Welland v. Citicorp Inc.,* 2003 WL 22973574, 2003 U.S. Dist. Lexis 22721, (S.D.N.Y. Dec. 17, 2003), Plaintiff challenged the characterization of his termination as being "for cause" and the resulting loss of his unexercised stock options upon discharge. Judge Buchwald held:

It is insufficient to defeat defendants' motion for Mr. Welland to assert that he did not violate the policies. Rather, the material issue is whether defendants decision to terminate him was made on a

reasonable basis. *See DeLeonardis v. Credit Agricole Indosuez,* 2000 U.S. Dist. LEXIS 16506, No. 00 Civ. 0138, 2000 WL 1718543 at \*12 (S.D.N.Y. Nov. 15, 2000) (stating that the relevant inquiry is not whether the violative acts occurred, but whether the decision to discharge the employee was reached honestly and after an appropriate investigation). Thus, our inquiry should be focused not on factual disputes that have arise since the time of Mr. Welland's termination, but on the information that was available to and relied on by defendants prior to the termination. *Welland v. Citicorp, Inc.,* 2003 WL 22973574, 2003 U.S. Dist. LEXIS 22721 (S.D.N.Y.2003) (emphasis added), *aff'd* 116 Fed.Appx. 321 (2d Cir.2004).

Applying this relatively clear caselaw to the unusual facts of this case is somewhat difficult, to say the least. On their face, the facts of this case are bizarre; a highly placed, highly paid executive dumped, and required to forfeit vested options estimated at $471,000.00 for stealing $400.00 under debatable circumstances. The facts simply do not ring true and are not consistent with the reputation of IBM, once the largest employer in Westchester County, as a kindly and paternalistic employer.

IBM clearly had the right to act as it did, if the decision maker(s) honestly (but wrongly) was convinced that it was Plaintiff, not Tanel who authorized the printing of the directory, *and* if the gratuitous print job was a violation of published FCS Guidelines. Also, lying to the investigators is a good ground for discharge, if the decision maker(s) honestly disbelieved Johns' explanation that in the seven or eight months that had elapsed, he had forgotten the email warning.

■ The legal standard is clear enough, as set forth in *Gehrhardt* and *Welland, supra.* The standard does not take its source from the implied covenant of good faith and fair dealing contained in every New York contract. Rather, it expresses public policy and reflects the abhorrence of Equity for a forfeiture.

■ Based on the record before this Court on the motion, the Court is unable to say that there are no disputed issues of material fact bearing on whether the decision to forfeit the vested options was made honestly and in good faith. Plaintiff suggests that a bad motive existed, in the nature of retaliation for having been a critic of "channel stuffing". The record is barren of evidence as to the treatment of stock options for others who improperly expensed small items. Selective enforcement thus presents a distinct possibility. If Johns had the foresight (and the funds) to have exercised his vested options as soon as he knew he was under investigation, he would have avoided forfeiture. If, as appears likely, the investigation was both hasty and flawed in that Frank Tanel, not Plaintiff "initiated" the inappropriate conduct, a trial jury may find that it was not conducted in good faith. Similarly, Plaintiff asserts (Affid. at 55) that "similar offenders were not pursued" and over $150,000 of such printing was done in a year.

Plaintiff may be unable, on a full trial record to satisfy his burden of proof by a preponderance of the credible evidence, that the decision to forfeit all his vested options was not reached honestly and in good faith. He should have the opportunity to do so, IBM having at least failed to achieve the exalted purpose of the Mikado.[5] Denial of summary judgment is ad-

---

**5.** My object all sublime
   I shall achieve in time
   To let the punishment fit the crime,

The punishment fit the crime. The Mikado Act II, W.S. Gilbert, 1885.

dressed to the discretion of the Court, in a case that would benefit from a full trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Neither do we suggest that the trial courts should act other than . with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.") The *Anderson* Court cited to *Kennedy*, which provided: "[w]hile we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide." *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948). In addition, our Court of Appeals has held:

> [S]ummary judgment has, on occasion, been deemed inappropriate where a fuller record is thought to be an essential prerequisite to intelligent, informed resolution of complex questions of law. And the courts have often held that genuine issues of material fact exist, within the meaning of the summary judgment rule, where, as here, reasonable men differ about the inferences to be drawn from undisputed basic facts.

*Tanaka v. Immigration & Naturalization Service,* 346 F.2d 438, 447 (2d Cir.1965) (citations omitted). *See also* 11 *Moore's Federal Practice,* § 56.41[3][d] (Matthew Bender 3d ed.) ("The trial court has the right to exercise its discretion to deny a motion for summary judgment, even if it determines that a party is entitled to it, if, in the court's opinion, the case would benefit from a full hearing.")

All claims except the claim for breach of the stock option agreements are dismissed. Mr. Johns was an employee at will who could be terminated at any time, for any reason or for no reason. There was no fraud in the inducement or other fraud, and no breach of the employment contract. The Court declines to make the finding at this time contemplated by Fed.R.Civ.P. Rule 54(b).

Jury selection for this case is set for February 22, 2005 at 9:15 A.M. Counsel shall submit proposed *voir dire* and requests to charge, exhibit lists and copies, etc. at their early convenience.

SO ORDERED.

### ADDENDUM to Memorandum and Order dated January 6, 2005

■ By joint motion filed February 17, 2005 and fully submitted for decision on February 25, 2005, both attorneys move "for an Order vacating or withdrawing the Court's January 6, 2005 Memorandum and Order." The Court is being invited to engage in the improbable task of unringing a bell, since the Order has been a matter of public record for more than seven weeks. After the Court denied summary judgment to the Defendant and ordered a jury trial of the case to begin on February 22, 2005, Counsel agreed to a resolution of their litigation and a Stipulation and Order of Dismissal with Prejudice and Without Costs was executed and approved by the Court on February 14, 2005. This joint motion followed.

Several reasons are given for wanting to suppress this Court's decision. First, it is claimed that the settlement (in which the Court had no part) required IBM to amend its business records to convert the Plaintiff's September 2002 termination to a voluntary resignation. It is said, therefore, that the parties joint interest in classifying the Plaintiff's termination as a voluntary resignation can be served by vacating the Order or sealing it from public view, since a reader of this Court's decision might think otherwise. Secondly, IBM asserts that the Order "conflicts with the law of this Circuit," and points

out that this Court strongly urged counsel to settle their case. It is claimed without any rational explanation that "having done so, it would be a disservice to the parties and indeed would undermine the spirit of their settlement agreement to let the Order stand as part of the public record."

■ This Court does not believe that the decision "conflicts with the law of the Circuit." The law of the Circuit is not set forth in *Welland v. Citicorp, Inc.*, 116 Fed. Appx. 321 (2d Cir., December 3, 2004) affirming 00 Civ. 738(NRB), 2003 WL 22973574 (S.D.N.Y., December 17, 2003). In the first place, a Summary Order by the Court of Appeals affirming a District Court decision does not state the law of the Circuit. Secondly, this Court cited the District Court opinion in *Welland* favorably but District Court opinions including *Welland* do not state the law of the Circuit. *See Gasperini v. Center for Humanities*, 518 U.S. 415, 443 n. 10, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

■ The application also expresses a concern that IBM should not have to address the "potential collateral estoppel effect of the Order in future litigations." This contention is ridiculous. The Order has no collateral estoppel effect. First, the decision does not decide any issue, it only determines that summary judgment should not be granted in the case. Second, collateral estoppel (issue preclusion) contemplates the existence of a valid and final judgment in prior litigation in which an issue of fact or law necessary to the judgment was actually decided, so as to preclude relitigation of the issue in a later case involving a party or privy. Moore's Fed. Pract. 3d, § 132.01[4][c]. The decision complained of does not meet that description.

While this Court has the power to seal the record at this late date, such a sealing order could not be enforced against anyone who had copied it prior to the sealing, and who would remain free to circulate or publish the opinion. Also, such an order would not limit the power or right of any participant to know about it, tell about it, or write about it.

Whenever Court documents are sealed, this is done at the expense of truth. The parties and their privies are fully familiar with what took place in the action, and for reasons of their own, desire to refrain from sharing that information with the public. This Court is maintained at great public cost to resolve issues of the sort presented in civil litigation. Persons do not have to litigate, and indeed they are free to resolve their matters without the assistance of the Court by private mediation, arbitration or otherwise. Once having sought the aid of the Court to adjudicate issues, it seems unwarranted to suggest that their use of the public Court system should be suppressed and kept secret from others, including the taxpayers who paid for it, and might find the Court's work of interest.

■ The right to inspect documents derives from the public nature of courts. The common law right of free access to the Courts as well as First Amendment interests are implicated when official Court documents are sealed. As our Court of Appeals has recently held:

> In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973[ ] (1980), and its progeny, the Supreme Court recognized that the First Amendment grants both the public and the press a qualified right of access to criminal trials...The circuits, including ours, have concurred in holding that this right applies to civil as well as criminal proceedings...Numerous federal and state courts have also extended the First Amendment protection provided by *Richmond Newspapers* to particular types of judicial documents, determining

that the First Amendment itself, as well as the common law, secures the public's capacity to inspect such records.

*Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 91–92 (2d Cir.2004) (some citations omitted).

Sealing Court documents also threatens the Court's own integrity. Government functions at its best in the broad sunlight. Openness in government is a fundamental requirement for a just democratic society. So it is in the Courts. Openness and transparency preclude the suspicion of inculpatory content or conduct, which may easily arise when court documents are protected from public scrutiny. If court decisions are regularly issued in public format, and thereafter sealed and suppressed, corruption, favoritism and abuse of power must follow, and mischief is made easy.

The Court declines to vacate or seal the opinion. The joint motion is denied for want of merit.

SO ORDERED.